# JOHN CROSBY, JR. AND ANOTHER v. THE CRESCENT OIL COMPANY OF MINNESOTA.[1]

June 22, 1934.

No. 29,769.

*Mitchell, Gillette, Nye & Harries, William K. Montague,* and *Dunn & Butchart,* for appellant.

*Baldwin, Holmes, Mayall & Reavill,* for respondents.

*JULIUS J. OLSON, Justice.*

Appeal from an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial.

[1]Reported in 255 N. W. 853.

Plaintiffs were copartners engaged in the business of operating a gasolene service station at Duluth. This action was brought by them against defendant to recover damages for alleged fraudulent representations which induced them to waive a clause in a lease to the property occupied by them requiring 60 days' notice of cancelation. Originally the lease ran from the fee owners to plaintiff Crosby and one Wagner. Prior to the events which took place and which led up to the present difficulty, Wagner assigned his interest to the plaintiff Schwartz.

The defendant was engaged in the distribution of petroleum products at wholesale. In the early part of March, 1932, plaintiffs and defendant entered into negotiations resulting in the execution of a sublease by plaintiffs to defendant of the oil station by the terms of which plaintiffs were to handle the petroleum products distributed by the defendant. This arrangement continued until June 25, 1932. At that time a new deal was made so that plaintiffs were thereafter to operate the station as employes of defendant and to continue until July 31, 1935. One of the provisions in that instrument reads:

"Both parties hereto expressly agree that the foregoing instrument contains the entire contract between the parties hereto and that said parties have made no other agreement written or verbal which modifies, supplements or affects the within instrument except the aforesaid chattel mortgage and note and written lease to the aforesaid premises."

About two weeks after the original agreements were entered into, probably toward the end of March, Mr. Berman, for the defendant, and the plaintiffs had some talk to the effect that if the defendant acquired the fee title to the premises a new agreement would be entered into with plaintiffs whereby the leased premises were to be occupied by the plaintiffs upon different terms than those mentioned in the contract of June 25, 1932. It is this conversation out of which the present action arises.

In the lease running from the owners of the fee to the plaintiffs it was provided that the plaintiffs were to have the use of the

leased premises for a period of five years from August 1, 1930. The lease contained a clause which permitted the lessors to terminate the same. A brief quotation from the lease is perhaps of value here:

"It is hereby understood and agreed that in case the within described premises are sold or ground-leased for a long term of years or desired for permanent improvement, the lessors [fee owners] shall have the right to terminate this lease at any time by giving at least two months' written notice of intention to terminate this lease."

If the lease was canceled, under the terms of this agreement, during the first year of its term, the amount to be paid plaintiffs was to be four-fifths of the cost of the improvements; if canceled during the second year, three-fifths; if canceled during the third year, two-fifths; and if terminated during the fourth year, one-fifth of the original cost.

Prior to the time of the making of the agreements mentioned plaintiffs had operated their filling station as agents for other oil companies. It is the claim of plaintiffs that defendant was interested in procuring this location for the purpose of enlarging its trade facilities and that this was the motivating cause for bringing about the change of plaintiffs' former employment to defendant's service. Plaintiffs had an investment in the leased premises of about $2,500 in the way of buildings and permanent equipment. Under the terms of their lease with the fee owners their future tenure or occupation of the premises was somewhat uncertain and precarious. As stated, towards the end of March, 1932, plaintiff Crosby approached Mr. Berman, representing defendant, on the subject of the defendant acquiring the fee. As this is the foundation for the present action, a rather complete quotation of the testimony may be of value:

Q. "Now, after you had entered into your first agreement with the Crescent Oil Company, did you have any talk with any of the officers of the company in regard to the purchase of the property by the Crescent Oil Company?

A. "Yes, sir. It was just a couple of weeks after we entered into the agreement of March 7.

Q. "And with whom did you have that talk?

A. "Mr. Berman.

Q. "Who was it that first suggested that the Crescent Oil Company might buy this property?

A. "I suggested it.

Q. "To whom did you make that suggestion?

A. "Mr. Berman.

Q. "Why was it that you brought up the matter of buying the property or the Crescent Oil Company's buying the property?

A. "Well, because we had considerable investments there, and they had quite an investment there in pumps and tanks and so forth, and there was a clause in our lease, 60 days' cancelation in case of sale, and someone else might have the property, and in that case we would be out.

Q. "You had in mind, then, in bringing up the matter of the possible purchase of this property, the cancelation of the lease that you had with the fee owners of this property?

A. "Yes.

Q. "Your understanding of that provision was that it provided for a cancelation of your lease upon 60 days' notice in case the fee owners sold the property to someone else?

A. "Yes.

Q. "And it occurred to you that if the Crescent Oil Company should buy the property that would protect your interests and also that of the Crescent Oil Company?

A. "Yes, sir.

Q. "Now, in connection with the conversation which you had with Mr. Berman about buying the property, did you have any conversation with Mr. Berman as to what arrangements he would make with you and Mr. Schwartz if he did buy the property?

A. "Yes, sir.

Q. "And will you state what that conversation was?

A. "Well, I asked him what sort of a deal they would make with us in case they bought the property and our station, because then they would have the entire investment.

Q. "Did Mr. Berman tell you what kind of a deal he would make with you if he bought the property?

A. "Yes, he did.

Q. "What did he tell you?

A. "He said the profits would be about half a cent less on the gasolene, and our rent would be about five per cent of his investment."

Immediately after this conversation plaintiff Crosby testified that he introduced Berman to one or more of the fee owners. Nothing definite came of this, however, until August 16, 1932, at which time plaintiffs executed a waiver of the 60-day notice provided for in their lease with the fee owners. Defendant had, prior to the execution of the waiver just referred to, secured an option from the fee owners for the purchase of the premises. The waiver was executed at the request of Miss LeDuc, one of the owners, who informed plaintiff Crosby that the defendant would not buy the property unless such release or waiver was secured. Plaintiffs claim that they knew nothing about the option at the time this waiver was signed. On the date of the execution of this instrument the owners of the fee, the plaintiffs, and perhaps also Mr. Berman were at the office of the attorneys. The instrument had been prepared by them and was ready for signature. Plaintiffs claim that they would not sign the waiver if the defendant company failed to buy the premises; in other words, their claim is that they would not execute this release if the fee owners were to convey the property to any other grantee than the defendant. Mr. Crosby claims that he asked Berman if he was sure that they, the plaintiffs, were to stay at the station. Berman assured him that they would. With this understanding, so plaintiffs claim, the waiver was signed and left with the attorneys, who agreed to keep the instrument in their possession and if defendant did not purchase the premises the instrument was to be destroyed; otherwise it was to be effective. On September 21, 1932, the plaintiffs, including also Mr. Wagner, one of the original lessees, executed a further instrument (exhibit F), which reads:

"We having heretofore by an instrument in writing waived the two months written notice and all notice of intention to terminate said lease, and

"Whereas the lessors under the aforesaid lease have by warranty deed of even date sold and conveyed the aforesaid premises among other lands to the Conoco Oil Company, a Delaware corporation, now,

"In consideration of the sum of one thousand ($1,000) Dollars to us in hand paid by Clara A. LeDuc, Ida E. DeVoist, Hattie A. Dryer and Nellie A. Smith, lessors, receipt of which is hereby acknowledged in full settlement under the terms of aforesaid lease, we hereby and by these presents do release the said Conoco Oil Company, a Delaware corporation, its associate companies, being the Crescent Oil Company, a Minnesota corporation, and the Continental Oil Company and all other corporations or firms associated therewith and Clara A. LeDuc, Ida E. DeVoist, Hattie A. Dryer and Nellie A. Smith, lessors under the aforesaid lease, from any and all claims and damages arising under the aforesaid lease and hereby surrender and discharge any right or interest we may have thereunder."

This instrument was acknowledged by Mr. Wagner on the date of the instrument, September 21, 1932, and by the other assignors, Crosby and Schwartz, on September 27, 1932.

On September 19, 1932, plaintiffs executed a further instrument (exhibit G), to the effect that they, the plaintiffs, "having operated said gasolene service station from the 25th day of June, 1932, under an agreement in writing of that date entered into between us and the Crescent Oil Company of Minnesota, a Minnesota corporation, and,

"Whereas the aforesaid premises have been sold and our rights under a former lease to said premises having been released, now,

"In consideration of the sale by us of all of our equipment at the aforesaid premises under an instrument in writing of even date to the said Crescent Oil Company of Minnesota, a Minnesota corporation, and in further consideration of the settlement of all of

our accounts with said Crescent Oil Company and for other good and valuable consideration, we hereby and by these presents do release and discharge the said Crescent Oil Company of Minnesota, a Minnesota corporation, from all further obligations under the aforesaid agreement dated June 25th, 1932, the said agreement and by these presents being terminated and further surrender and waive all further rights or interest to the possession of the aforesaid premises under any and all color or right thereto."

On the same day the plaintiffs executed a bill of sale covering all of the property by them owned or possessed in and upon the leased premises to the defendant for a stated consideration of $400. The bill of sale is in the usual form and contains the customary warranties. The $1,000 payment recited in the release (exhibit F) is evidenced by a check in that sum bearing the indorsement of plaintiffs. At the time the first agreement was entered into between the plaintiffs and the defendant, plaintiffs were indebted to their former wholesale oil dealer in a considerable sum. Defendant furnished the means with which to pay and discharge that indebtedness, and to secure that sum plaintiffs executed and delivered to defendant a chattel mortgage covering their property used in and upon the leased premises, the debt so secured being $860.65. This indebtedness was liquidated and fully paid out of the proceeds of the $1,000 check.

In defendant's behalf the claim is made that the conversation had in March, 1932, consisted merely of a friendly discussion as to general arrangements customarily made by defendant company with its agents when it owned the property; that several plans were talked about but that no definite plan was made or any agreement reached. Mr. Berman (with whom the conversation was had) testified that neither he nor anyone else for defendant had any plan formulated to acquire the property from the fee owners; that no fraud or deceit was intended or practiced and not the slightest attempt was made or even suggested that plaintiffs should release or relinquish any of their rights or interests in the property. As a matter of fact neither plaintiff claims that there was any waiver or relinquishment talked about or considered until a few days be-

fore August 16, at which time Miss LeDuc approached plaintiff Crosby on the subject.

The instruments referred to are not claimed to be different from what they were represented to be. There is no charge of fraud or deceit in respect of what the instruments themselves contain or were intended to accomplish. The whole question hinges upon whether the promissory representations made by Mr. Berman in March, 1932, are sufficient, in view of what happened later, to make a foundation for the present cause of action.

The fraud issue was by the court submitted to the jury upon the single question of whether the statements and representations made by Mr. Berman in March, 1932, to plaintiff were made falsely and fraudulently "with the evil intent and purpose of deceiving and cheating the plaintiffs" and that plaintiffs, relying thereon, executed the various instruments and releases to their damage. A verdict for plaintiffs in the sum of $3,000 was returned.

Defendant has assigned six errors, grouped by it into two parts: (1) Whether the evidence justifies a finding of fraud, and (2) whether the court applied the proper rule of damages. If the first question raised be resolved as urged by defendant, the second need not be considered.

In order for plaintiffs to prevail the evidence must sustain the jury in finding that when the conversation took place in March, nearly five months before the waiver of August 16 was executed by plaintiffs (at the request of the fee owners) and more than six months before defendant acquired the ownership of the property, there was a fraudulent intent and purpose on the part of Berman to induce the execution and delivery of a relinquishment of plaintiffs' 60-day right to retain possession of the property after notice of its sale. The claim of plaintiffs appears absurd. In what way could it by such practice gain any advantage? If such plan was on Mr. Berman's mind, why would he on defendant's behalf enter into a new arrangement (June 25) whereby plaintiffs obtained definite and advantageous rights extending until July 31, 1935?

Plaintiff brought about the connection with Mr. Berman. Nothing was intimated in the discussion indicating in any way that

defendant desired that plaintiffs surrender any right or interest they might have. It does not even appear that Mr. Berman knew anything about the 60-day cancelation clause in plaintiffs' lease. If he knew about it and desired to get rid of it, why was the matter not brought into play at or immediately before the new agreement of June 25 was entered into? No request for such action on plaintiffs' part came from defendant. The request came from the fee owners. If defendant desired to get rid of plaintiffs' interest in the property it would have been an easy matter to have purchased the fee, given the 60-day notice (or have the fee owners so do), and obtained possession as soon or sooner than it actually did. The evidence does not harmonize with plaintiffs' claims. The facts and circumstances are at least as consistent with fair and honest dealing on defendant's part as with fraudulent conduct and purpose. The only right plaintiffs had to the property was that of occupancy for a 60-day period after notice of termination upon making a sale. How this very meager right could have given a valid basis to a $3,000 verdict is indeed difficult of comprehension.

But there are other and even more difficult obstacles to plaintiffs' recovery. The many written instruments hereinbefore noted, solemnly made and executed by plaintiffs, for valid and valuable considerations, cannot be brushed aside and made for naught upon such flimsy pretexts as here exist. Is any court justified in permitting belated oral claims to set aside contemporaneously made written instruments directly contradicting the assertions now relied upon? What is to be believed, present notions of what happened long ago or contemporaneously executed documents? On September 21, 1932, in consideration of $1,000, plaintiffs acknowledged a "full settlement" and discharged the defendant and the fee owners "from any and all claims and damages arising under the aforesaid lease and hereby surrender and discharge any right or interest we may have thereunder." (Exhibit F) And on September 29, "in consideration of the sale by us of all our equipment * * * and in further consideration of the settlement of all of our accounts with said Crescent Oil Company * * * we hereby and by these presents do release and discharge" defendant "from all further obli-

gations under the aforesaid agreement dated June 25th, 1932, * * * and further surrender and waive all further rights or interest to the possession of the aforesaid premises under any and all color or right thereto." (Exhibit G)

This court had occasion recently to pass upon a situation similar to this in McCreight v. Davey T. E. Co. 191 Minn. 489, 254 N. W. 623. The syllabus reads:

"1. Even if it be supposed that a signed writing is but partial integration of a contract, a parol, contemporaneous agreement is inoperative to vary or contradict the terms which have been reduced to writing.

"2. Proof of promissory fraud, inducing a written contract, cannot be made by representations contradictory of the terms of the integration.

"3. Mere nonperformance or denial of a promise is ordinarily not sufficient to show that it was fraudulently made, i. e. with no intention that it should be performed."

There, as here [191 Minn. 493], "the case is in the much tangled field of the kind of fraud resulting from promissory undertakings." Written contracts [191 Minn. 494] "would be an absurd futility" if the parol evidence rule were not operative. And, said the court [191 Minn. 494]:

"It may be added that fraud cannot be predicated upon the mere fact that a promise has been broken. * * * There must be evidence to justify a trier of fact in concluding that, when the promise was made, there was no intention of performing it. * * * It would be as wrong morally as legally, as offensive to logic as to law, to hold that mere denial and nonperformance are evidence that, if a promise was made, it was made fraudulently. * * * Bad indeed would be the case of the honest man who has made no such promise, if when falsely charged with it, he may not deny it without having his truth considered as some evidence either that there was such undertaking or that it was deceitfully made."

The reasoning employed and the authorities cited in the case mentioned compel a reversal here.

Reversed with directions to enter judgment for defendant notwithstanding the verdict.