CALL CARL, INC., a Delaware
Corporation, et al., Appellants,

v.

BP OIL CORPORATION, a Delaware Corporation, and Standard Oil Company
(Ohio), an Ohio Corporation, Appellees.

CALL CARL, INC., a Delaware
Corporation, et al., Appellees,

v.

BP OIL CORPORATION, a Delaware Corporation, and Standard Oil Company
(Ohio), an Ohio Corporation, Appellants.

Nos. 76–1345, 76–1346.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 8, 1976.

Decided April 26, 1977.

John Henry Lewin, Jr., Baltimore, Md. (Benjamin R. Civiletti, Venable, Baetjer & Howard, Baltimore, Md., on brief) for appellees in No. 76–1345 and for appellants in No. 76–1346.

Jerry S. Cohen, Washington, D. C. (Michael D. Hausfeld, Washington, D. C., William C. Sammons, Tydings & Rosenberg, Baltimore, Md., on brief), for appellants in No. 76–1345 and for appellees in No. 76–1346.

Before BRYAN, Senior Circuit Judge, WIDENER and HALL, Circuit Judges.

WIDENER, Circuit Judge:

In late summer of 1973, the plaintiffs, ten independent service station operators doing business in Maryland as BP dealers, were notified by BP that their leases and franchise agreements would not be renewed when their current terms expired. Business expectations frustrated, litigation was not far behind. The operators charged BP along with its parent corporation, Standard Oil Co. of Ohio (SOHIO), with terminating their franchises as part of a price fixing conspiracy in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. State law claims for breach of contract and fraudulent misrepresentation were asserted as well.

Trial was held in the district court with a jury, and at the close of the plaintiffs' case defendants were granted a directed verdict on the count alleging violations of the Sherman Act. The other counts were submitted to the jury, which found that there had been no breach of contract by the defendants, but that BP and SOHIO were liable

under the Maryland law of fraud and deceit. Damages of more than 1.2 million dollars were awarded by the jury, about half of which was ordered remitted by the court in lieu of a new trial on the issue of damages. The district court opinions are reported as 391 F.Supp. 367 (D.Md.1975) and 403 F.Supp. 568 (D.Md.1975).

Appeals are taken by both sides. Plaintiffs claim the district court erred in directing a verdict on the antitrust count and in remitting approximately $600,000 of the jury's damage award. BP and SOHIO allege error in the district court's fraud and deceit damage charge, and assert that they are entitled to judgment on the merits of that count. We view plaintiffs' antitrust allegations as lacking in merit and affirm the district court's grant of a directed verdict in favor of the defendants. On the fraud and deceit count, however, we find ourselves in agreement with BP and SOHIO that the jury was erroneously instructed on the proper measure of damages in this case, and that under the evidence there should have been no award of damage on the fraud count. The district court's judgment for the plaintiffs on that count will therefore be reversed.

At the time of BP's incorporation in 1969, plaintiffs Call Carl, Inc., Gage, Smith, Luksenburg and DeLeonibus had operated their service stations under the Sinclair tradename pursuant to short-term, renewable leases. When BP acquired Sinclair properties on the East Coast in 1969, it took over these leases for the remainder of their terms and, as they expired, renewed them for additional periods, with the plaintiffs becoming BP dealers. In only one instance, that of the plaintiff Smith, was a lease renewed for a period longer than one year, in accordance with BP's policy of limiting franchise agreements to one year terms.

The years 1970–1972 witnessed the expansion of BP marketing in the Washington, D. C. area through traditional franchise arrangements. During this period, BP acquired the service stations later operated by the other five plaintiffs, Cochrane, Stickell, Loekle, Sherbert, and Diaz. These five were initially given six-month leases and supply contracts that could be, and in fact were, later renewed, but again never for longer than one-year terms. Each of the plaintiffs' agreements with BP specified that, after the expiration of an initial period of time, they would be renewed "thereafter for successive terms of one year each, provided, however, that either party may terminate the lease at the end of the first one-year or any successive yearly term on Thirty (30) days' written notice given prior to the end of any such term."

BP suffered substantial losses during the years 1970–72 and, by the fall of 1972, was re-evaluating its marketing program in the Washington, D. C. area. A tentative list of candidates for franchise non-renewal was prepared, and certain stations were identified as suitable for transition to no-frill Gas & Go stations, geared toward the provision of gasoline and oil cheaply and quickly, with no additional services provided. BP decided that the stations operated by the plaintiffs would be converted to the Gas & Go format, and in September 1973 gave timely notice to the plaintiffs that their dealerships would not be renewed at the expiration of their terms.[1] Because of an injunction *pendente lite* issued by the district court, plaintiffs did not actually vacate the stations until February 1976.

A threshold issue is whether plaintiffs, having accepted a remittitur "under protest," may nevertheless contest the propriety of the remittitur on direct appeal, rather than having to seek such review

---

1. Between March 22, 1973 and July 17, 1973 the leases and supply agreements for nine of the ten plaintiffs came up for renewal. Plaintiff Smith's two-year lease did not expire until August 31, 1974.

Prior to BP's formal notification of non-renewal in September 1973, it had renewed the existing leases of Call Carl and Diaz for one

more year, and had entered into new short-term leases embodying rental increases with Loekle, Luksenburg, Cochrane, Sherbert, DeLeonibus, and Gage. Stickell was notified in May 1973 that his lease would not be renewed when it expired on July 16, 1973. He accepted a month-to-month tenancy thereafter.

after a new trial. This is an issue over which the circuits have divided at least three ways,[2] though, somewhat anomalously, it seems to us it has long been settled by the Supreme Court against appealability. See *Woodworth v. Chesbrough,* 244 U.S. 79, 37 S.Ct. 583, 61 L.Ed. 1005 (1917); *Koenigsberger v. Richmond Silver Mining Co.,* 158 U.S. 41, 52, 15 S.Ct. 751, 39 L.Ed. 889 (1895). Cf. *Lewis v. Wilson,* 151 U.S. 551, 14 S.Ct. 419, 38 L.Ed. 267 (1894). Any contention that this prohibition had grown stale with the passage of time has been put to rest by the Court this year in *Donovan v. Penn Shipping Co., Inc.,* 536 F.2d 536 (2d Cir. 1976), aff'd. 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), where the preclusion of direct appeal from a remittitur, accepted with or without qualifications, was reaffirmed. In *Woodworth,* the Court of Appeals found a damage award supported by insufficient evidence, but granted plaintiff the option of filing a remittitur in lieu of a new trial. The plaintiff did so, purporting to preserve his right to challenge the remittitur in the Supreme Court in a cross proceeding. Although defendant's writ of error was decided on its merits, plaintiff's cross writ of error was dismissed by the Court, which was unwilling to permit a successful litigant to secure a conditional judgment and at the same time seek to retract the condition upon which that judgment was obtained.

We find it necessary to discuss this issue despite our reversal of the district court on the merits of the fraud and deceit count because it implicates still a larger, related, threshold question of relevance to the remaining issues before us—whether plaintiffs' attempted acceptance of the remittitur under protest, when direct appeal is not permitted, is in fact an acceptance for the

purpose of rendering the district court's judgment a final, appealable order from which either side might appeal on other grounds. Once a remittitur is accepted, the reduced judgment achieves finality quite apart from whether the order of remittitur can then be appealed. But if the proper course for the district court in this case was to treat plaintiffs as having rejected the remittitur, then a new trial should have been ordered, and none of the issues in this case would properly be before us for review, for such orders are interlocutory in nature and leave no final judgment from which to appeal. *Atlantic Coast R. R. Co. v. Sonenshine,* 226 F.2d 220 (4th Cir. 1955).

Again, we look to the Supreme Court's opinion in *Woodworth* for guidance. There, the Court of Appeals apparently treated the remittitur as having been accepted although it attempted to reserve a non-existing right of review. The Supreme Court did not indicate that the Court of Appeals acted properly in this regard, and indeed the effect of the Court's holding was to leave the plaintiff with his reduced judgment, which amounts to no less than treating the conditional acceptance as unconditional. If the district court treated plaintiff's response to its order of remittitur as an unconditional acceptance in the present case, we think it was correct in doing so. See *Donovan v. Penn Shipping Co., Inc.,* 536 F.2d 536 (2d Cir. 1976), aff'd. 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977).

■ As a final threshold matter, although plaintiffs are precluded from appealing the district court's order of remittitur on their fraud and deceit count, we see no reason why they should not be able to raise before this court the propriety of the directed verdict entered against them on

---

**2.** Compare *Steinberg v. Indemnity Ins. Co.,* 364 F.2d 266 (5th Cir. 1966) (Plaintiff who consented to entry of reduced judgment only conditionally, as a means to facilitate appeal, suffered sufficiently adverse adjudication to allow an appeal) with *Dorin v. Equitable Life Assurance Society,* 382 F.2d 73 (7th Cir. 1967) (By consenting to remittitur, plaintiff waived objection to judgment entered) and *Mooney v. Henderson Portion Park Co.,* 334 F.2d 7 (6th Cir.

1964) (Appealability of remittitur in diversity case treated as a matter of state law). See also Wright and Miller, *Federal Practice and Procedure,* § 2815 at 105–06. For a discussion of the policies in favor of both sides of the appealability issue, compare *the* majority and dissenting opinions in *Donovan v. Penn Shipping Co., Inc.,* 536 F.2d 536 (2d Cir. 1976), aff'd. 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977).

the Sherman Act count. As we have said, the final judgment rule presents no bar, for, the acceptance being deemed unconditional, the order in fact is final, and we do not think that the reasons for prohibiting direct appeals from remittiturs require such a result with respect to entirely separate and distinct causes of action once a remittitur has been accepted on one count of a complaint. Whether phrased in terms of waiver or estoppel, the many cases prohibiting direct appeals from remittiturs base their preclusion on the idea that a plaintiff should not be able to appeal from a judgment to which he has consented and from which he has accepted benefits.[3] But the mere acceptance of benefit in a case not involving remittitur from a judgment is not necessarily an absolute bar to appeal with respect to separate or divisible controversies. *United States v. Newton Livestock Auction Mkt., Inc.,* 336 F.2d 673 (10th Cir. 1964). The acceptance of a remittitur under a complaint divided into distinct and separate causes of action, as here, would seem to be simply a specific application of this general principle, and while we are unaware of a case that has decided the precise question before us in the context of a remittitur, the case of *Kneas v. Hecht Co.,* 257 Md. 121, 262 A.2d 518 (1970), suggests a similar analysis in dicta. There, plaintiff filed a remittitur and accepted payment. The court, while recognizing the exception to the rule of waiver where the portion of the decree appealed from adjudicates a separate and distinct claim unrelated to the portion favorable to appellants, held that the exception did not apply since there was but one cause of action involved in that case.

We do not think that plaintiffs' action in accepting a remittitur to avoid a new trial on fraud and deceit damages indicates as a matter of law their assent to a directed verdict entered against them on the antitrust count of their complaint. We therefore conclude that plaintiffs are entitled to maintain this appeal on the antitrust count, but not as to the correctness of the remittitur, and we proceed to the merits.

## I

## ANTITRUST COUNT

The thrust of plaintiffs' Sherman Act claim is that BP, in not renewing the leases and supply contracts, engaged in an unlawful refusal to deal with plaintiffs in furtherance of a scheme to fix the retail price of gasoline products. In *Osborn v. Sinclair Refining Co.,* 286 F.2d 832 (4th Cir. 1960), we held that the cancellation of a franchise by a single oil company could constitute a refusal to deal in violation of § 1 of the Sherman Act when it occurred pursuant to an unlawful scheme of tying the sale of Goodyear tires, batteries and accessories to the sale of Sinclair gasoline. Plaintiffs in this case seek to establish the underlying illegality pervading their non-renewals by pointing to BP's desire in implementing Gas & Go to achieve control over the price of its products at the retail level.

■ It is apparent that the determinative issue is whether Gas & Go stations are operated directly by BP through its own employees or, as plaintiffs urge, by independent operators. If the latter, then BP could be guilty of price fixing, which is *per se* violative of § 1 of the Sherman Act. *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). See *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Osborn v. Sinclair Refining Co.,* 324 F.2d 566, 573 (4th Cir. 1963). And BP's non-renewal of plaintiffs' franchises pursuant to such a price fixing scheme could well constitute an unlawful refusal to deal. *Osborn,* 286 F.2d 832 (4th Cir. 1960); see *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). If, on the other hand, Gas & Go stations are operated directly by BP, there can be no underlying price fixing conspir-

---

**3.** See *Woodworth v. Chesbrough,* 244 U.S. 79, 37 S.Ct. 583, 61 L.Ed. 1005 (1917); *Kneas v. Hecht Co.,* 257 Md. 121, 262 A.2d 518 (1970); *Turner v. Washington Suburban Sanitary Commission,* 221 Md. 494, 158 A.2d 125, 130–31 (1960), and cases cited therein.

acy upon which to hinge a *per se* § 1 violation,[4] for BP is entitled to select the price at which it sells its own products, and is further entitled to change its system of marketing on the retail level from independent franchises to direct company operation. See *Simpson,* 377 U.S. p. 21, 84 S.Ct. 1051; *Phillips v. Crown Central Petroleum Corp.,* 395 F.Supp. 735, 761 (D.Md.1975).[4a]

Each of the plaintiffs was offered the opportunity of becoming an "I-manager" of his converted station, as were all independent BP dealers whose stations were selected for Gas & Go. The plaintiffs, each of whom declined the offer, claim that the I-manager appellation is a mere subterfuge designed to enable BP to fix the prices of independent dealers, similar to the consignment practice condemned in *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). In *Simpson,* gasoline retailers entered into one year lease and consignment agreements with the respondent oil company, pursuant to which the oil company retained title to the gasoline until sold, paid property taxes on the same, and fixed the price at which it was sold. The station operator, paid by commission, assumed all costs of station operation, and bore the risk of all losses of the gasoline in his possession, save for specified acts of God. He was also required to carry personal liability and property damage insurance with respect to the gasoline. While the Court in *Simpson* acknowledged the legality of owner price control in legitimate consignment arrangements, the company was held to have violated § 1 of the Sherman Act when it refused to renew the operator's lease solely because he sold gasoline below the fixed price.

While BP's I-manager scheme is not totally devoid of indicia of independent operation, in that the I-manager is paid by commission rather than salary, and is responsible for paying the salaries of subordinate employees and any cash shortages that may occur, the rights and responsibilities of an I-manager irrefutably place him in the category of a BP employee. In contrast to the situation in *Simpson,* BP pays all costs of station operation, except for the station payroll, and is responsible for accidental losses of gasoline on the station premises. BP pays all sums for Social Security, unemployment compensation and workmen's compensation with respect to the I-manager and his subordinates. Finally, an I-manager, unlike an independent operator, can be discharged like any employee on twenty-four hours notice. Had the judgment of the district court not held an I-manager to be in fact an employee, we would have been required to set it aside.

■ We therefore think that this antitrust complaint resolves itself into nothing more than an oil company, faced with severe losses, deciding to change its operations on the retail level to assume direct operation of its own stations rather than leasing them. The fact that a desire to control retail prices contributed to this decision, far from establishing the illegality of the scheme, requires utilization of the method chosen. Any other approach could have constituted unlawful price fixing. The district court was justified in concluding as a matter of law that the essential duality of parties required for an unlawful contract, combination or conspiracy was not proven in this case.

## II

### FRAUD AND DECEIT COUNT

At trial, plaintiffs contended that they were induced to enter into franchise agreements with BP by oral representations on

---

**4.** With respect to the existence of a horizontal conspiracy between BP and its parent, SOHIO, the district court held that the theory of intra-enterprise conspiracy exemplified by *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), was inapplicable to this case because BP and SOHIO are not in competition in the market in which prices were allegedly being fixed, and there is horizontal

competition in that market from other sources. No assignments of error are directed at the district court's analysis of this issue, and we therefore have no occasion to analyze it ourselves.

**4a.** *Phillips* was vacated and remanded on other grounds in 556 F.2d 702 (4th Cir. 1977).

the part of BP agents, known by the agents to be false, to the effect that the agreements, though of one-year duration, would be renewed annually as long as plaintiffs complied with their contractual obligations. Plaintiffs claimed that these representations, made at various times between 1971 and 1973 by three BP employees, Taggart, Southern, and Tousey, were made with deceptive intent, and that they were relied upon by the plaintiffs, who thereby refrained from seeking more advantageous business opportunities.

■ The district court correctly charged the jury on the five elements of legal fraud in Maryland: (1) a representation made by a party was false; (2) its falsity was either known to the party or made with such reckless indifference to the truth to impute knowledge; (3) the misrepresentation was made for the purpose of defrauding some other person; (4) that person reasonably acted in reliance upon the misrepresentation with full belief in its truth, and he would not have done the thing from which damage resulted had it not been made; and (5) the person so acting suffered damage directly resulting from the misrepresentation. See *James v. Goldberg*, 256 Md. 520, 261 A.2d 753, 758 (1970).

As related above, the thrust of plaintiffs' complaint is that they entered into franchise renewals with BP in reliance upon fraudulent assurances that BP would not exercise its contractual right of non-renewal at the end of successive yearly lease terms, and that they were damaged by reason of having foregone other business opportunities. The jury determined that the plaintiffs sustained their burden of proof on the five elements of actionable fraud. Out of an abundance of respect for its findings,[5]

we base our reversal only on the fifth—the existence of damage. We think the jury was incorrectly instructed on the issue of damages, and that, in any event, the evidence of damage was insufficient to sustain the recovery.

The jury was instructed that if the defendants were found liable for either breach of contract or fraud, the measure of damages would be the same—the plaintiffs would be entitled to the "benefit of their bargain." Then, in its application of the benefit of the bargain measure of damages, the district court essentially instructed the jury to consider the future profits plaintiffs would have earned had their leases been indefinitely renewed.

■ In recent years, Maryland has adopted a flexible approach to damage measurement in fraud and deceit actions and, in appropriate cases, the benefit of the bargain measurement may properly be applied. *Hinkle v. Rockville Motor Co.*, 262 Md. 502, 278 A.2d 42 (1971). This is not such a case.

In *Hinkle*, plaintiff purchased an automobile, represented to be new, which in fact had been driven over 2,000 miles and had been involved in an accident. The Maryland court permitted recovery of the difference in value between the car as represented at the time of its sale and its actual value, as measured by the repairs necessary to return it to its new condition, which the court held was the benefit of the plaintiff's bargain. Among the guidelines for application of this damage measurement, the court continued, "(2) if the fraudulent representation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the

---

5. Nevertheless, we cannot ignore the fact that two of the ten plaintiffs, Smith and Stickell, did absolutely nothing in reliance upon any false representations made prior to their lease expiration dates in 1973. This is because Smith did not have a renewal date for his two year lease until August 31, 1974, after he received his formal notification of non-renewal, and Stickell, unlike the remaining eight plaintiffs, was not offered the opportunity to renew his lease in 1973.

While the complaint may be less than a model of clarity in defining exactly when the false statements relied upon were made, seeming to rely upon some representations made in 1971 and 1972, there is insufficient evidence from which the jury could have found that BP had knowledge of their falsity prior to the time the company started to re-evaluate its marketing practices in late 1972. See *Bell v. Speed Queen*, 407 F.2d 1022 (7th Cir. 1969).

latter alone." 278 A.2d at 47, quoting *Selman v. Shirley,* 161 Or. 582, 609, 85 P.2d 384, 394 (1938). And in *Downs v. Reighard,* 265 Md. 344, 289 A.2d 299 (1972), where negligence formed the basis for damages against a surveyor who erroneously computed acreage in preparing a subdivision plat for the plaintiff, the plaintiff was permitted to recover the value of 2.5 acres of land that he had paid for, but never received, as the benefit of his bargain.

We have found no case, however, in which the benefit of the bargain measurement has been applied to compensate a plaintiff for loss of an orally-created expectancy that is known to be directly contrary to the terms of a written agreement.[6] The plaintiffs here claim entitlement to lost future profits although each one knew that his franchise agreement was by its provisions of limited duration and expressly non-renewable by either party on thirty days' notice. Indeed, plaintiffs assert it was in response to concerns expressed by them about the short terms of their agreements that the fraudulent assurances of perpetual terms were made. In such circumstances, damages for reliance on such assurances, as indicated by plaintiffs' complaint, may have been appropriate, if proved. Rescission or reformation might also have been appropriate avenues of pursuit. But damages for loss of an expectancy of profits created by prior or contemporaneous oral representations plainly contradictory with the terms of a written contract we believe to be non-recoverable if written contracts are to retain significance. See *General Corp. v. General Motors Corp.,* 184 F.Supp. 231 (D.Minn.1960); *Crosby v. Crescent Oil Co.,* 192 Minn. 98, 255 N.W. 853 (1934).

It is true that the parol evidence rule presents no bar to proof of fraud in a fraud and deceit action, *Standard Motor Co. v. Peltzer,* 147 Md. 509, 128 A. 451 (1925); nor in an action for rescission even where oral representations are expressly disclaimed in the contract. *Ortel v. Upper Ashburton Realty Co.,* 171 Md. 678, 190 A. 239 (1937). But we do not believe that the Maryland Court of Appeals would extend this principle to permit damage awards that, by the expedient of a fraud label, would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties. See *Housing Authority of College Park v. Macro Housing, Inc.,* 275 Md. 281, 340 A.2d 216 (1975). This result finds support in the case of *Canatella v. Davis,* 264 Md. 190, 286 A.2d 122 (1972), where the court, in an action for fraud and breach of real estate covenants, noted that the relaxation of the parol evidence rule for fraud is recognized only in the pursuit of equitable remedies, such as reformation or specific performance. The plaintiff, having sued for damages, was held to have chosen his form of action at law, and was therefore subject to the constraints of the parol evidence rule. If Maryland law will not allow contract damages (as sought here) for loss of an expectancy created in *Canatella* both by oral representation and a previous writing inconsistent with the terms of a deed in an action on its covenants, we do not think it would do so in a fraud action based wholly on oral representations plainly contradictory to the terms of a contract, as appears in this case.

As an additional, though related, reason for not awarding benefit of the bargain

**6.** In somewhat similar circumstances, it has been held that proof of promissory fraud, inducing a written contract, cannot be made by representations contradictory of the terms of the integration. *Crosby v. Crescent Oil Co.,* 192 Minn. 98, 255 N.W. 853 (1934). With respect to recovery of benefit of the bargain or out of pocket damages in such a case, see *General Corp. v. General Motors Corp.,* 184 F.Supp. 231 (D.Minn.1960).

In *A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957), a dealer of trucks and cranes was terminated by defendant manufacturer under a contract clause permitting either party to terminate the relationship at any time. For two years prior to the cancellation, the plaintiff dealer had been falsely told that he would never be canceled except for good cause. The New York Court of Appeals held that a cause of action for fraud had been stated, but recognized that lost future earnings was inappropriate as a measure of damages.

damages in this case, we note that the guidelines set forth in *Hinkle* may well call for such a measurement only when the misrepresentation is akin to a breach of warranty, as in the sale of goods context. While we do not suggest that the rule can only apply in such a setting, we do not think that there can be a legitimate expectancy, or any cognizable bargain, when the plaintiff knows that the terms of his written agreements run contrary to that expectancy. Thus, this case is quite unlike those fraud cases in which the quality or quantity of goods is misrepresented to an unsuspecting buyer.

■ Finally, even applying the benefit of the bargain rule to these facts, the plaintiffs are not entitled to lost future profits, in effect contract damages. For this case differs from many fraud cases in still another respect—it contains aspects of misrepresentation of future events, not only of past or existing fact. A fraud action can only be predicated on misrepresentation of past or existing fact; breach of future promises lies in the realm of contract. *Blondes v. Hayes,* 29 Md.App. 663, 350 A.2d 163, 168 (1976); *Schwartzbeck v. Loving Chevrolet, Inc.,* 27 Md.App. 139, 339 A.2d 700 (1975). The only actionable fraud that could have been committed by BP, therefore, lies not in its failure to renew the leases, but in its misrepresentation of its existing intention to do so at the time the actionable statements were made. *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Ortel v. Upper Ashburton Realty Co.,* 171 Md. 678, 190 A. 239 (1937). Of course, the only damages that may be properly awarded are those that flow as the natural, proximate and direct effect of the fraudulent act. See *Empire Realty Co. v. Fleisher,* 269 Md. 278, 305 A.2d 144 (1973). Lost profits were proximately caused by the actual failure to renew the franchise agreements, which, as a series of future events, could not support an action for fraud. Thus, properly applied to the facts of this case, the benefit of the bargain rule might well entitle plaintiffs to the difference in value between a short-term lease which the lessor presently intends to renew (i. e. as though the fraudulent representation had been true), and one which the lessor intends to terminate. Even in the former case, the intention could not be considered irrevocable, and the truth of its expression at one moment could give way to a legitimate change of mind in the next. We must therefore conclude that the difference in value must be negligible, for it was not proved, and there is no damage under the benefit of the bargain formulation proximately caused by defendants' fraud.

■ Ordinarily, when an erroneous damage charge is given, we should remand to the district court for a new trial on the issue of damages. Such a remand would not serve a useful purpose in this case, however, because plaintiffs either have not, or could not, introduce sufficient evidence of damage to justify an award on any permissible theory. They have failed to prove damage resulting from lost business opportunities, although alleged in the complaint. The jury was not instructed with respect to such damages, and plaintiffs did not object to the omission. The jury was instructed on other reliance damages—loss from investment in inventory, stock and equipment—but clearly no such damage could have occurred here as a result of BP's fraud. This is because, while plaintiffs may have made such investments as a result of 1973 lease renewals, they also operated their stations during those lease terms, as well as during the next two years because of the district court's injunction, and no evidence appears that any such initial investment lingered on until the dissolution of the injunction. Undoubtedly any investment made in reliance on BP's fraud in 1973 has long since been recouped by plaintiffs in normal operating, and sales, and profits, else evidence would have been offered to establish it.

As an alternate basis for the result we reach here, we do not think the plaintiffs could reasonably have relied upon the allegedly fraudulent statements made in the face of plainly contradictory contractual language. In *James v. Goldberg,* supra, the

Maryland court upheld a directed verdict against a plaintiff in a fraud and deceit action, holding that he had no right to rely upon allegedly false oral statements that were clearly belied by the language of the written agreement between the parties. Just as strong is the opinion of this court in *Holt v. Quaker Oil Refining Co.*, 67 F.2d 170 (4th Cir. 1933), in which, on facts practically identical to the case at hand, we approved the district court's exclusion of evidence of false oral promises of indefinite distributorship renewal, when the written contract between the parties called for a one-year, renewable, business relationship. A directed verdict for the defendant was again upheld.

We find *James*, and perhaps *Holt*, quite persuasive, if not actually controlling, and denominate those cases an alternate ground only because it is difficult for us to say with assurance, in view of the seemingly endless number of fraud cases in Maryland that arise out of contractual dealings, that circumstances cannot exist in which the rule may be relaxed for limited purposes.

The judgment of the district court is accordingly affirmed as to the antitrust count and reversed as to the fraud count.

*AFFIRMED IN PART; REVERSED IN PART.*