KARDIOS SYSTEMS CORPORATION

v.

The PERKIN-ELMER CORPORATION.

Civ. No. JFM–84–3956.

United States District Court,
D. Maryland.

Sept. 5, 1986.

Keith S. Rhodes and William A. Hylton, Jr., Hylton and Gonzales, Baltimore, Md., for plaintiffs.

Alan N. Gamse, Semmes, Bowen & Semmes, Baltimore, Md., and Kenneth A. Gallo, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for defendants.

## MEMORANDUM

MOTZ, District Judge.

This is an action brought by Kardios Systems Corporation against the Perkin-Elmer Corporation alleging breach of an implied contractual "best efforts" obligation and negligent and fraudulent misrepresentation.[1] Perkin-Elmer has moved for summary judgment. The parties have filed

---

1. A claim for alleged theft of trade secrets has been resolved by the entry of a consent order.

extensive memoranda and a hearing on the motion was held on July 18, 1986. The motion will be granted.

## FACTS

Kardios is a small computer technology company engaged in the design, manufacture and sale of computer equipment. Perkin-Elmer manufactures and designs computer systems, including hardware. Perkin-Elmer competes with IBM but is a much smaller company, holding a very small percentage of the market. Its primary market over the years has not been end users, but OEM (original equipment manufacturer) customers. Its expertise has primarily been in the technical, as opposed to the commercial, market.

The parties' relationship began in 1976 when they entered into an OEM agreement. Under that agreement Kardios purchased Perkin-Elmer computer systems (at a discount on credit), added technology of its own and sold the systems to the end user. When this relationship was established, Kardios began to work on the product which is the subject of this law suit. Essentially, the product translates language in IBM programs to language that Perkin-Elmer programs can utilize and permits a Perkin-Elmer computer to "emulate" or "imitate" an IBM computer (without making it fully compatible with IBM technology.)

Kardios sold its first unit in 1977, and by 1981 it had sold a total of ten units. However, Kardios was having difficulties in its marketing efforts and discussed with a number of Perkin-Elmer employees the possibility of Perkin-Elmer marketing the product. As early as the fall of 1979 a representative of Perkin-Elmer asked William Parks, the vice-president and operations manager of Kardios who represented Kardios throughout its dealings with Perkin-Elmer, to submit a written proposal for a joint business relationship. Parks did so. Continuing discussions ensued and three drafts of an agreement were exchanged. Each of these drafts included a provision requiring Perkin-Elmer to use its "best efforts" to market the product.

Although the agreement as finally negotiated was reviewed by lawyers on each side before it was executed, the negotiations were conducted by business representatives of the two companies. The employees negotiating on behalf of Perkin-Elmer made it clear to Parks that while they were authorized to enter into negotiations, they had no authority themselves to enter into any agreement and that the terms of any agreement would not be binding unless their superiors at Perkin-Elmer executed the agreement and approved its terms.

The parties did reach agreement, and on September 1, 1981 a contract was signed. As executed, the contract did not contain a "best efforts" clause. It did confer "exclusive" marketing rights upon Perkin-Elmer except that (1) there was an express reservation for Kardios "to maintain its present distributorship arrangement with ... [two] Kardios distributors," and (2) Kardios had the right to terminate Perkin-Elmer's exclusive right to market after eighteen months if Perkin-Elmer had not sold 100 units. The agreement, which was for a five year term, provided that Kardios technology would be marketed by Perkin-Elmer with Kardios' assistance. Kardios was to receive a royalty payment on each sale and, in addition, Perkin-Elmer paid Kardios up front $20,000 and relieved $10,000 of Kardios' existing debt to Perkin-Elmer in the approximate amount of $122,500. The contract contained an integration clause and a one-year limitations period for bringing suit "arising out of the transaction" under it.

The first proposal submitted by Parks to Perkin-Elmer in the fall of 1979 included a provision in which Kardios set out its specific sales goals and stated: "we know our product and the commercial market are both new to PE and goals for other markets may not be directly applicable, but our experience indicates that they are probably realistic." Contemporaneous Perkin-Elmer memoranda written by Perkin-Elmer employees (below the level of those who made

the final decisions on the contract) indicated that they believed the product had potential in the commercial market, and Parks perceived that the persons with whom he was negotiating generally wanted to get into the end user and commercial market. However, no draft of the agreement after the first draft contained any reference to the commercial market.

Contemporaneous internal documents also reflect that there were several higher echelon managers at Perkin-Elmer who believed that the Kardios product was a poor business risk. They felt that the product appealed to buyers hunting for a bargain who would not want to pay for services or support and that Perkin-Elmer did not have qualified sales personnel to support the marketing effort. Perkin-Elmer did, however, spend considerable time, effort and money (including $134,000 in consulting fees paid to Kardios) to sell the product to Lockheed Corporation for use in a technical project known as "CADCAM." Lockheed had expressed interest in the product for the CADCAM market in June 1981 and in November 1981 Perkin-Elmer—with Kardios' knowledge—entered into a joint development agreement for the CADCAM project. Perkin-Elmer continued to pursue this project but finally terminated its efforts in late 1984, after it had sold only 20 units and had lost two million dollars in the venture.

Perkin-Elmer never made extensive efforts to penetrate the commercial market with the Kardios product. This was consistent with its overall marketing strategy of trying to locate "niches" into which it could sell. This strategy was necessitated by its lack of the broad based sales and support resources required for competition on the open market. Beginning in or about April 1982, Parks began repeatedly to request information as to the status of Perkin-Elmer's marketing efforts. He was told that Perkin-Elmer had not yet trained a sales force and was not ready to market the product. Parks' inquiries continued. In September 1982 he wrote to a Perkin-Elmer representative, reminding him that the

contract required 100 sales per year and urging Perkin-Elmer to adopt a plan to enter the commercial as well as the technical market. He invited Perkin-Elmer representatives to a special meeting of the Kardios directors held on February 24, 1983. These representatives stated that the CADCAM project had taken a large amount of resources but that CADCAM was proving successful and that other marketing efforts could proceed. According to his deposition testimony, Parks was impressed with this presentation, decided to forget the performance under the first eighteen months of the contract and instead gave himself an ultimatum to terminate the exclusivity clause sixty days after the directors' meeting if no results flowed from Perkin-Elmer's new efforts.

There is evidence that up until approximately the time of the directors' meeting in February 1983 Perkin-Elmer, being concerned about possible loss of its exclusivity rights, led Parks on as to the scope of its intended commercial marketing efforts. However, Kardios alleges no such promises to have been made after that meeting. In the late spring or early summer of 1983 Parks learned that Perkin-Elmer had named a new manager for the product in whom he had no confidence. Thereafter, Perkin-Elmer's marketing efforts continued to bear no fruit. In September 1984 Kardios terminated the exclusivity clause of the agreement. In October 1984, this suit was filed.

## DISCUSSION

Perkin-Elmer asserts numerous grounds in support of its motion for summary judgment. Three of these grounds are clearly dispositive: (1) Perkin-Elmer had no best efforts obligation under the contract; (2) all of plaintiff's claims are barred by the one year limitations provision in the contract; and (3) plaintiff cannot recover expectancy damages (the only damages which it claims) for alleged pre-contractual repre-

sentations inconsistent with the express terms of the contract.[2]

### The September 1, 1981 Agreement Did Not Impose A "Best Efforts Obligation Upon Perkin-Elmer

The September 1, 1981 Agreement contains a provision that the agreement is to be interpreted under the law of New York, and the parties are therefore agreed that New York law governs the question of whether the agreement imposed a best efforts obligation upon Perkin-Elmer. No provision in the agreement expressly imposes such an obligation. Therefore, if the obligation exists at all, it must be implied.

The landmark case of *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917) found an implied duty on the part of the licensee of a licensed product to use diligent efforts to promote the sale of the product. The Court held that, as a technical matter, the existence of such an obligation was necessary to provide the mutality of obligation required to make the contract legally binding. Further, as subsequent cases have articulated, it would be inherently "unfair to place the productiveness of the licensed property solely within the control of licensee, thereby putting the licensor at his mercy, without imposing an obligation to exploit upon the licensee." *Vacuum Concrete Corp. v. American Machinery and Foundry Co.*, 321 F.Supp. 771, 773 (S.D.N.Y.1971). However, as a general proposition, implied duties are strongly disfavored under New York law. *In re KDT Industries, Inc.*, 30 B.R. 252 (S.D.N.Y.1983); *cf. Murphy v. American Home Prod. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Certainly, the existence of a best efforts obligation should not be lightly inferred since such an obligation subjects the licensee to significant litigation exposure and deprives him of the fundamental power of determining for himself the reasonableness of his marketing efforts.

In this case there is no justification for implying in the September 1st agreement a best efforts duty which the parties did not choose to include expressly. The implication of such a duty is not necessary to establish mutuality of obligation and, for at least four reasons, this is not an instance in which Kardios was "at Perkin-Elmer's mercy" under the terms of the contract.

First, Kardios' remedy in the event of Perkin-Elmer's failure to market the product successfully was expressly delineated. If Perkin-Elmer did not sell 100 units within the first eighteen months, Kardios had the right to terminate the agreement. Thereafter, it was free to market the product itself. *See Eastern Electric, Inc. v. Seeburg Corp.*, 310 F.Supp. 1126 (S.D.N.Y. 1969), *aff'd*, 427 F.2d 23 (2d Cir.1970).

Second, under the terms of the contract Kardios had throughout the terms of the contract the right to market the product through two distributors who were expressly described as "Kardios distributors." Kardios contends that one of these distributors was actually an agent of Perkin-Elmer and that neither he nor the other distributor had substantial capability to market the product. However, implication of a best efforts obligation is a question of contract interpretation, and Kardios has recited no authority and has pointed to no facts which would justify going beyond the four corners of the agreement to ascertain its meaning. By its own terms the contract did not confer completely exclusive marketing rights upon Perkin-Elmer.

Third, Kardios received significant payments, independent of royalties from sales of the product, under the agreement. For example, it received $60,000 from Perkin-Elmer upon execution of the agreement and an additional $134,000 in consulting fees in connection with the CADCAM project.

Fourth, while perhaps not conclusive in itself, reference to earlier drafts of the agreement is instructive. *See Vacuum Concrete Corp. v. American Machinery and Foundry Co., supra.* The record is uncontradicted that the representatives of

---

**2.** In light of the fact that these three issues are clearly dispositive, the Court need not reach the merits of other contentions made by Perkin-Elmer.

Perkin-Elmer who were involved in the contract negotiations made it clear to Kardios that they had no authority to make any commitments on behalf of Perkin-Elmer and that the terms of the agreement would only be those finally accepted by their superiors. The drafts of the agreement exchanged during negotiations all contained best effort clauses. The final version, the one accepted by those in authority at Perkin-Elmer, imposed no best efforts obligation and included an integration clause. This bargaining history confirms that, as evident from the face of the agreement itself, the parties spelled out their respective rights and obligations expressly and did not intend that an unspoken best efforts obligation was to be superimposed upon Perkin-Elmer's express undertakings.

*Kardios' Claims Are Barred by the One Year Contractual Limitations Period*

■ The September 1, 1981 agreement contains a one year limitation clause reading as follows: "No action regardless of form arising out of the transaction under this Agreement may be brought by Kardios against PE more than one (1) year after the cause of action has arisen."

This clause governs both Kardios' contract claim and its tort claims. The language "regardless of form arising out of the transaction under this Agreement" is clearly broad enough to cover all actions arising from the parties' relationship. *Cf. Soviero Bros. Contracting Corp. v. City of New York*, 286 A.D. 435, 142 N.Y.S.2d 508 (1955), *aff'd*, 2 N.Y.2d 924, 161 N.Y.S.2d 888, 141 N.E.2d 918 (1957); *Jandous Elec. Const. Corp. v. City of New York*, 88 A.D.2d 821, 451 N.Y.S.2d 124, *aff'd*, 57 N.Y.2d 848, 455 N.Y.S.2d 768, 442 N.E.2d 65 (1982); *see also Hoffman v. Burroughs Corp.*, 571 F.Supp. 545 (N.D.Tex.1982).

Kardios contends that nevertheless its claims are not barred because under Maryland law—which it contends is controlling of the question[3]—its cause of action did not accrue until Kardios has or reasonably should have known of Perkin-Elmer's wrongful conduct. Assuming that the Maryland discovery rule is applicable here, the factual record is uncontradicted that Kardios knew or should have known of Perkin-Elmer's conduct more than one year prior to the filing of suit.

The gravamen of Kardios' claims both for breach of contract and for misrepresentation is that Perkin-Elmer failed to market the product commercially. Kardios was aware of this failure from September 1981 on and suit was not filed until October 26, 1984. Further, within the first year of the contract term Kardios was aware of specific decisions which Perkin-Elmer was making which directed its marketing efforts away from the commercial market.

In order to overcome these uncontradicted facts, Kardios alleges that misrepresentations were made by Perkin-Elmer personnel that Perkin-Elmer would be commencing commercial marketing activities. However, the last such alleged misrepresentation to which Kardios points was made by Perkin-Elmer representatives at the Kardios board of directors meeting on February 24, 1983. Parks, the Kardios executive responsible for the proposal, set for himself a deadline of sixty days in which to determine whether Perkin-Elmer was meeting its commitment. Within that sixty days not only did Perkin-Elmer fail to take the steps which Parks wanted, it also appointed as the new product manager a man whom Parks believed was totally incapable of the job. According to Parks' deposition testimony, upon learning the news of that appointment, he would have "would have jumped out the window" of his building "if it wasn't all on the first floor." He "knew we were dead-ended" and "knew there was never going to be anything done." If that was not enough to put Kardios on notice of

---

**3.** Kardios also appears to contend that Maryland law applies to the question of whether the tort claims are governed by the one year limitations provision. This contention is without merit. New York law governs that question since it is strictly one of contract interpretation.

*See Restatement (2d of Conflicts,* Section 142, Comment C and Sections 187–188; *IBM Corp. v. Catamore Enterprises Inc.,* 548 F.2d 1065, 1073 n. 15 (1st Cir.1976); *cert. denied,* 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).

its claim, in September 1983 Perkin-Elmer's new product manager told Parks that Perkin-Elmer all along had "intended to do this thing for CADCAM" only and that the Kardios product "all along had been a CADCAM only deal." These statements were substantially identical to statements made by Martin Waters, another Perkin-Elmer representative, in February 1984 which Kardios alleges gave triggering notice to it of Perkin-Elmer's default.

These facts speak for themselves. Kardios knew of the accrual of its cause of action within the first year of the contract term. It can point to no concealing misrepresentation made after February 24, 1983. After that date new facts came to its attention unequivocally demonstrating that Perkin-Elmer was not marketing the product to Kardios' satisfaction, specifically in the commercial market. More than a year prior to the filing of suit Kardios was told that it had never been Perkin-Elmer's intent to so market the product. Under these circumstances Kardios' claims are clearly time-barred.

*Kardios is Not Entitled to Recover Expectancy Damages on its Misrepresentation Claims*

■ Kardios rests its claim for damages entirely upon a benefit of the bargain theory. It seeks to recover expectancy damages based upon Perkin-Elmer's pre-contractual oral representations (alleged alternatively to have been fraudulently or negligently made) that Perkin-Elmer would market the product commercially. As a matter of law, Kardios is not entitled to recover such damages.

*Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir.1977) is controlling. There, construing Maryland law, the Fourth Circuit held that a plaintiff may not recover damages for loss of an orally created expectancy that is directly contrary to the terms of a written agreement. That is precisely what Kardios is seeking to do here. As indicated above, the September 1, 1981 agreement did not—expressly or impliedly—include a best efforts obligation or any other obligation to market the product commercially. Further, the agreement did

contain an integration clause, expressly stating "this Agreement constitutes the complete and exclusive statement of the Agreement between the parties relating to the subject matter hereof."

As stated by the Fourth Circuit in *Call Carl*, to permit recovery of expectancy damages under such circumstances would be completely to undermine the policies underlying the parole evidence rule. *See also Jones v. International Inventors Inc. East*, 429 F.Supp. 119 (N.D.Ga.1976); *cf. United States v. Idlewild Pharmacy Inc.*, 308 F.Supp. 19 (E.D.Va.1969). Additionally, just as in *Call Carl*, the alleged misrepresentations relied upon by plaintiff related to the state of mind of defendants' representatives when they stated Perkin-Elmer's intent to market the product commercially. Since Perkin-Elmer could legitimately change its plans after these representations were made, the representations cannot form a basis for the award of expectancy damages. *See Call Carl*, 554 F.2d at 631.

For these reasons, Perkin-Elmer's motion for summary judgment is granted.