**SILICON POWER CORPORATION**

v.

**GENERAL ELECTRIC ZENITH CONTROLS, INC.**

**Civil Action No. 08–4331.**

United States District Court, E.D. Pennsylvania.

Sept. 29, 2009.

Christopher D. Wagner, Gene M. Link-meyer, Neal A. Jacobs, Jacobs Law Group, P.C., Philadelphia, PA, for Silicon Power Corporation.

Elizabeth R. Leong, Robinson & Cole LLP, Hartford, CT, Kent Wicker, Reed Wicker PLLC, Louisville, KY, for General Electric Zenith Controls, Inc.

## MEMORANDUM

PADOVA, District Judge.

Silicon Power Corp. ("Silicon Power") commenced an arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, against General Electric Zenith Controls, Inc. ("GE Zenith") on December 18, 2003, claiming that GE Zenith had breached two agreements between the companies related to the development and sales of low voltage static transfer switches ("LVSTS"). On June 11, 2008, the arbitrator denied Silicon Power's claims in all respects. Silicon Power subsequently filed the instant Motion to Vacate Arbitration Award in this Court. GE Zenith filed a Response in Opposition to the Motion and we held a Hearing on September 11, 2009. For the following reasons, we deny the Motion to Vacate Arbitration Award.

## I. FACTUAL BACKGROUND

### A. *Silicon Power's Innovative Electric Transfer Switch Technology*

Transfer switches switch a component from one power source to another in the event that the first power source fails. (8/20/07 Arb. N.T. at 26–27.) In 1998, Silicon Power developed a low voltage transfer system and subsequently developed technology for ultra fast low voltage static transfer switches ("UFLVSTS"). (*Id.* at 18, 20, 22–23.) Silicon Power developed a prototype UFLVSTS in 2000. (*Id.* at 23, 28.) In 2002, the prototype was able to transfer between two power sources within one millisecond. (*Id.* at 28.)

In July 2000, Silicon Power commenced discussions with Bank of America regarding a possible initial public offering. (Id. at 33.) Bank of America encouraged Silicon Power to obtain mezzanine financing and Silicon Power held investment discussions with GE Capital beginning in September 2000.[1] (*Id.*) GE Capital brought in GE Zenith to discuss two proposals, a joint development agreement for development of the UFLVSTS technology and an exclusive distribution agreement. (*Id.* at 33–35.) GE Capital's investment in Silicon Power was contingent on Silicon Power using GE Zenith as a distributor. (8/23/07 Arb. N.T. at 501.)

GE Zenith was in the critical power market but did not sell static transfer switches. (12/10/07 Arb. N.T. at 16.) GE Zenith had customers who used static transfer switches purchased from other vendors and was interested in Silicon Power's UFLVSTS technology. (*Id.* at 16; 12/12/07 Arb. N.T. at 10–11.) GE Zenith understood from Dr. Mehta, President and CEO of Silicon Power, that the UFLVSTS technology would outperform existing

technology in terms of speed and size, would have a significant cost advantage, would dissipate less heat, and would take up less floor space than existing LVSTS products. (12/10/07 Arb. N.T. at 9.)

During GE Zenith's discussions with Silicon Power regarding the UFLVSTS, the parties also discussed developing and marketing LVSTS products in order to generate revenue to fund the development of the UFLVSTS. (*Id.* at 9–10.) The market for LVSTS products was very strong during the late–2000 to early–2001 time period when GE Zenith and Silicon Power were engaged in these discussions. (*Id.* at 10–11.)

### B. *The Agreements Between GE Zenith and Silicon Power*

GE Zenith and Silicon Power negotiated two agreements, a Joint Development Agreement ("JDA") and a Sourcing and Distribution Agreement ("SDA"). (Silicon Power Exs. 2, 3.) Under the SDA, Silicon Power agreed to provide and sell LVSTS and UFLVSTS products to GE Zenith on a sole and exclusive basis. (SDA Article 3. 1.) GE Zenith was granted the exclusive right to sell and distribute the LVSTS and UFLVSTS products in the United States, Canada and Mexico during the period beginning with the execution of the agreement on September 21, 2001, and terminating on the fifth anniversary of the date of the commercial launch of Silicon Power's LVSTS products. (*Id.*, Articles 1, 2.1, 3. 1.) GE Zenith was required to market these products using its "established sales channels." (*Id.*, Article 4.1). The SDA contains the following sales targets:

1. During the period from September 21, 2001 until the date that Silicon Power launched its LVSTS prod-

---

1. GE Equity, part of GE Capital, eventually invested $6 million in Silicon Power for the development of the UFLVSTS. (12/10/07 Arb. N.T. at 7–9.)

ucts, GE Zenith was to obtain $5–7 million in orders. (*Id.*, Article 4. 1.)

2. During the first twelve months following the launch date of the LVSTS products, GE Zenith was to obtain $12 million in orders. (*Id.*, Article 4.2.)

3. The goal for the second year after the product launch was to capture 15% of the LVSTS market. (*Id.*, Article 4.3.)

The sales targets were estimates to be used for planning purposes, "not a commitment by [GE Zenith] to purchase any quantity of Products." (*Id.*, Article 4.4.) The SDA provided that, if GE Zenith failed to achieve orders in the target range, the exclusivity provisions of the agreement would terminate. (*Id.*, Article 4.5). In addition, senior management from both parties were to meet and negotiate a mutually agreeable solution for GE Zenith's failure to achieve the orders target. (*Id.*, Article 4.6) If the parties could not reach a mutually agreeable solution within 30 days of such meeting, either Party would have the right to terminate the SDA under the termination provisions of the agreement. (*Id.*)

The SDA contains the following termination provision: either party could terminate the agreement if the other repudiated or breached the agreement and did not cure within 90 days after receiving written notice of the breach. (*Id.*, Article 2.3.) The SDA also provides that any disputes not settled by negotiation were to be arbitrated in accordance with the CPR Rules for Non–Administered Arbitration. (*Id.*, Article 15.5.) The arbitration would be governed by the FAA, take place in New York, New York before a single arbitrator, and use New York law. (*Id.*) The SDA also provides that neither party could appeal the arbitrator's award: "Neither Party shall seek recourse to a law or equity

court or other authorities to appeal such decision." (*Id.*)

The parties' companion agreement, the JDA, governed the parties' roles relating to the development of LVSTS and UFLVSTS products. (JDA Articles 1.I., 2.A.i.) The JDA contains specific requirements for development of the LVSTS and UFLVSTS products. (*Id.*, Attachs. A, B.) The JDA also contains lists of specific development tasks that Silicon Power and GE Zenith were to perform and the dates on which those tasks were to be completed. (*Id.*, Attachs. C, D.) The JDA also provides that the parties would each receive an equal, undivided interest in all joint inventions developed pursuant to that agreement. (*Id.*, Article 6.A.)

Like the SDA, the JDA also contains a provision whereby any disputes between the parties that could not be settled by negotiation would be arbitrated in accordance with the CPR Rules for Non–Administered Arbitration. (*Id.*, Article 7.) The arbitration would be governed by the FAA and take place in New York, New York before a single arbitrator using New York law. (*Id.*) The JDA also provides that neither party could appeal the results of the arbitration: "Neither Party shall seek recourse to a law or equity court or other authorities to appeal such decision." (*Id.*)

C. *GE Zenith's Sales Efforts Regarding Silicon Power's LVSTS Products*

Evidence was presented at the arbitration that, beginning in October 2001, GE Zenith put considerable effort into marketing Silicon Power's LVSTS products. (1/31/08 Arb. N.T. at 117,119–21.) GE Zenith assigned Tim Cole as the product manager for the LVSTS. (12/12/07 Arb. N.T. at 25.) Cole has a degree in civil engineering and an MBA. (1/31/08 Arb.

N.T. at 75–76.) He was also trained "as a G.E. six sigma black belt." (*Id.*) Cole spent about 80% of his time on the LVSTS. (12/13/07 Arb. N.T. at 201.) GE Zenith also assigned Spas Lazarov to work on sales for the LVSTS. (12/14/07 Arb. N.T. at 127–28, 132–33.) Lazarov has a dual degree in electrical and electronics engineering, and was an international sales manager with regional manager responsibility within the United States for GE Zenith. (*Id.* at 127–28, 131, 133.)

In addition to his personal involvement in LVSTS sales, Lazarov was also involved in training GE Zenith sales representatives with respect to the LVSTS. (*Id.* at 133–34.) GE Zenith and Silicon Power held three training sessions for GE Zenith's sales team in October and November 2001. (GE Zenith Ex. N.) The first session was held in Las Vegas, and at least one other session was held at Silicon Power's Exton, Pennsylvania facility. (12/13/07 Arb. N.T. at 211; 12/14/07 Arb. N.T. at 134; 1/31/08 Arb. N.T. at 86.) The Silicon Power employees gave the GE Zenith sales representatives an overview of the LVSTS, explained how it worked, and discussed sales strategies. (1/31/08 Arb. N.T. at 85–86.)

After these training sessions, Lazarov went to Silicon Power's factory to become more familiar with the LVSTS. (12/14/07 Arb. N.T. at 134.) He subsequently conducted multiple training sessions on the LVSTS product for his sales representatives, regional managers and consultants

at GE Zenith's Chicago factory, where a demonstration LVSTS had been installed. (*Id.* at 136.) GE Zenith loaded some large lamps on the demonstration LVSTS to show its sales force and potential clients how it transferred power between sources. (*Id.* at 137.) GE Zenith would typically have a visitor observe demonstrations of the LVSTS. (*Id.* at 18.) In addition, GE Zenith's sales representatives and manufacturers' representatives did "engineering lunch-and-learns" to promote the LVSTS.[2] (12/14/07 Arb. N.T. at 18.)

Thomas Duffy, who is presently the President of GE Zenith and was previously its Vice President of Sales for Power Quality, was also involved in GE Zenith's LVSTS sales efforts. (12/13/07 Arb. N.T. at 190, 195–96, 200.) During the arbitration, he explained that GE Zenith's sales efforts fit within its existing sales channels. (12/13/07 Arb. N.T. at 195–96.) As he explained, GE Zenith's sales representatives regularly lobby engineers and architects to approve GE Zenith's products for their projects so that GE Zenith can bid on their jobs. (*Id.* at 195.) Duffy explained that it is very important to be "named as an acceptable manufacturer in a bid specification .... So you have to call on this gate keeper, consulting engineer to get them to approve your product." (*Id.* at 195–96.) Consequently, GE Zenith sales representatives have relationships with major engineering and architectural firms and call on these firms as part of

2. Thomas Duffy testified that, in 2001, GE Zenith employed eight to ten sales representatives who worked exclusively for GE Zenith and 75–100 manufacturers' representatives (working for 28 different companies) who sold products for GE Zenith and also sold complimentary power products. (12/13/07 Arb. N.T. at 44, 193–94.) In addition, GE Industrial had 600 salespeople "who would, if they received an inquiry or if they ran into a customer who had a need for these kind of

products, would lead share that back into G.E. Zenith." (12/10/07 Arb. N.T. at 146.) GE Industrial salespeople who provided leads to GE Zenith would be compensated through a lead sharing system outside of their normal commission plan. (*Id.* at 150–52.) In May 2002, 23 of the 28 companies whose manufacturers' representatives sold the Silicon Power LVSTS for GE Zenith did not sell a competitive LVSTS product. (*Id.* at 153–55.)

their usual sales practices. (*Id.* at 197–98.) GE Zenith's sales representatives also call on end users, typically facility engineers, managers, and electrical contractors. (*Id.* at 198; 1/31/08 Arb. N.T. at 88.)

In addition to these efforts, GE Zenith's sales representatives held frequent telephone conferences to alert each other of sales opportunities. (*Id.* at 88–89.) GE Zenith also ran incentives with its manufacturers' representatives to "make sure we were getting our fair share of the sales guys' marketing time . . . ." (*Id.* at 92.) In addition, GE Zenith encouraged its sales representatives to promote the Silicon Power LVSTS products even in instances where they knew that another product had been specified by the architect or engineer. (*Id.* at 92–93.)

GE Zenith took additional steps to market the LVSTS product. It issued a press release on November 5, 2001, stating that it would "market and sell Low Voltage Static Transfer Switches (LVSTS) in North America." (GE Zenith Ex P.) It also mentioned the LVSTS products in a January 2002 article in U.S. Industry Today magazine, a trade publication. (12/11/07 N.T. at 108.) GE Zenith also prepared product bulletins for Silicon Power's LVSTS products in the 100A through 600A size. (1/31/08 Arb. N.T. at 112.)

GE Zenith also gave incentives to its sales representatives to provide the company with competitive market information about price levels and product offerings. (12/11/07 N.T. at 109.) In addition, GE Zenith made a presentation about the product to the CEO of GE Industrial Systems, his staff, and all of the executives in the GE Industrial Systems organization. (*Id.* at 115.) GE Zenith staff also attended national trade shows with Silicon Power to market the LVSTS product. (GE Zenith Ex. R at 5.) Lazarov also attended local trade shows to develop relationships with

local engineers and data center owners. (12/14/07 Arb. N.T. at 151–52.) GE Zenith had one or two demonstration LVSTS products that they brought to trade shows. (1/31/08 Arb. N.T. at 87.)

### D. *GE Zenith's Difficulties Selling Silicon Power's LVSTS*

Despite these efforts, GE Zenith had considerable difficulty selling Silicon Power's LVSTS products. It did not receive its first order for an LVSTS product late until late in the second quarter of 2002. (12/10/07 Arb. N.T. at 71.) There is evidence in the arbitration record that over-capacity of internet companies and telecommunications companies, together with the terrorist attacks of September 11, 2001, caused demand for LVSTS in the critical power industry (the largest market for LVSTS products) to decline sharply, approximately 60%, after the parties entered into the SDA and JDA. (12/11/07 Arb. N.T. at 88–90; 12/12/07 Arb. N.T. at 187–88; 12/13/07 Arb. N.T. at 7; 12/14/07 Arb. N.T. at 32–33; 1/31/08 Arb. N.T. at 138–40.) In addition, many customers who had previously purchased LVSTS products for data centers began to resell them "just like new" in 2002, depressing the price for new LVSTS products. (12/13/07 Arb. N.T. at 7–8.) Consequently, in early and mid–2003, GE Zenith learned that all of its quotes were priced too high because the market had collapsed. (12/14/07 Arb. N.T. at 33–34.) GE Zenith reduced its 25% markup on Silicon Power's LVSTS products and still received feedback that its quoted prices were as much as twice the competitive market price. (12/10/07 Arb. N.T. at 122–23.)

There is also evidence in the arbitration record that GE Zenith's sales efforts were hampered because Silicon Power did not provide GE Zenith with a prototype LVSTS until the second quarter of 2002.

(12/14/07 Arb. N.T. at 4.) On reason for the delay was that Silicon Power had designed its LVSTS units with circuit breakers from one of G.E.'s competitors and GE Zenith would not sell the LVSTS products unless they used G.E. breakers. (8/21/07 Arb. N.T. at 100–01.) Silicon Power had to engage in a significant redesign in order to accommodate the G.E. breakers. (*Id.* at 100.) When Silicon Power began its redesign, it had limited engineering resources and, therefore, started with the unit sizes that it thought were most common in the marketplace. (*Id.* at 109.) Silicon Power started with the 100–400 amp units which were the most marketable. (*Id.* at 110.) Silicon Power next focused on redesign of the 600 to 1200 amp units, which pushed out the design time-frame for the 1600 to 2000 amp units. (*Id.*) These delays further hampered GE Zenith's sales efforts because it did not have a complete product line ready for sale. (1/31/08 Arb. N.T. at 102–03; 12/14/07 Arb. N.T. at 32.)

GE Zenith also had other problems selling the LVSTS. According to Duffy, while Silicon Power's LVSTS was an adequate product, it was not superior to the competition. (12/13/07 Arb. N.T. at 202.) In addition, GE Zenith had no reliability data regarding Silicon Power's LVSTS to give to potential customers. (12/14/07 Arb. N.T. at 33, 49, 141.) Silicon Power's LVSTS products also missed some segments of the market because none of Silicon Power's LVSTS products combined the LVSTS with a power distribution unit ("PDU"). (*Id.* at 32.) Silicon Power worked with a company called Qualmag to develop a combined PDU/STS product. (1/31/08 Arb. N.T. at 129–30.) Silicon Power completed development of a combined PDU/STS May 2002, but GE Zenith never went forward with sales of that product. (12/10/07 Arb. N.T. at 93–94.) GE Zenith also had trouble getting timely quotes for prices for LVSTS products from Silicon Power because Silicon Power stopped manufacturing the switches in-house. (GE Zenith Ex. U.) In June, 2003, GE Zenith complained to Silicon Power that it was taking Silicon Power weeks to get it quotes when GE Zenith had only a few days to respond to customers, leading to lost orders. (*Id.*) Moreover, Silicon Power needed a six month lead time to produce some of its products to fill orders, which was two to three times longer than its competitors. (GE Zenith Ex. V.)

In addition, Silicon Power's LVSTS products depended on single power supply, creating a "single point of failure" that the critical power market considered to be a design defect. (12/14/07 Arb. N.T. at 31.) Cole explained that "whenever you create the possibility of a single point of failure or someplace where your redundancy is questionable, that becomes a giant ... potential problem for [customers in the critical power market.]" (1/31/07 Arb. N.T. at 93–94.) The other LVSTS products on the market at that time typically had two power supplies and one of GE Zenith's competitors manufactured a LVSTS product with three power supplies. (12/14/07 Arb. N.T. at 31.) In addition, the vast majority of the Silicon Power LVSTS products GE Zenith sold failed. (12/10/07 Arb. N.T. at 133.) Consequently, the Silicon Power LVSTS was not perceived as a high quality product. (*Id.* at 134–35.)

Evidence was presented at the arbitration that Silicon Power LVSTS products that GE Zenith sold to three customers failed catastrophically. GE Zenith sold three LVSTS products to John Deere. (8/24/07 Arb. N.T. at 90.) When the switches were tested during installation, one of the switches "went back and forth between prime power and alternate power ... a thousand times or something and that obviously wasn't by design ...." (1/31/08 Arb. N.T. at 91.) In November

2003, after the switches were installed, one of the switches experienced a catastrophic failure causing 30 tape storage device power supplies to fail. (GE Zenith Ex. AA.) The failure occurred in the John Deere facility that ran that company's parts inventory worldwide and the data had to be manually recovered. (12/14/07 Arb. N.T. at 163.) GE Zenith eventually fixed the problem with the John Deere switches by replacing some circuit boards. (*Id.*)

GE Zenith sold a Silicon Power LVSTS to Bridge Securities in South Korea. That switch failed in October 2003, causing the South Korean stock exchange to shut down. (*Id.* at 171–75; GE Zenith Ex. CC.) Silicon Power repaired the switch by replacing a gate driver. (GE Zenith Ex. CC.)

There were also problems with three Silicon Power LVSTS products that GE Zenith sold to Caterpillar Financial for use in its data center. (12/14/07 Arb. N.T. at 34–35.) GE Zenith's contractor, Travis Electric, went out to Caterpillar to do the startup and the switches didn't work. (*Id.* at 36, 39.) Although all three switches were supposed to be the same model, one was not, and its MMI Panel and control board did not match those of the other two switches. (GE Zenith Ex. EE.) There was also a problem with the firmware—the software in the microprocessors built into the switches—in that each of the three switches had different firmware. (12/14/07 Arb. N.T. at 36–37.) Moreover, because the switches were installed in a working data center, repairs could only be made if the entire system were shut down. (*Id.* at 37.) Silicon Power personnel made three visits to the Caterpillar Financial site over a period of months, but could not get the switches to work. (*Id.. ) GE Zenith eventually took back the switches and Caterpillar installed a competitor's LVSTS products. (*Id.* at 37–38.) Travis Electric

Company complained that the switches "were shipped out of [the] manufacturing facility *missing major components* that would have been easily recognized had someone inspected them first." (GE Zenith Ex. EE.) Caterpillar Financial complained that, once it uploaded newer software, it was able to get one of the switches to work; however, after several transfers, it shut down because several fuses had blown and part of its gate drive assembly had to be rebuilt. (*Id.*) Caterpillar Financial also reported that the switches were "shipped with missing parts, Kirk keys, documentation and nuts, bolts, screws and wiring falling out of the equipment. Two of the units had identical serial numbers. It would appear that the quality control department was out to lunch that day." (*Id.*)

### E. *Work that Silicon Power asked GE Zenith to Perform with respect to the LVSTS*

There is also evidence in the arbitration record that GE Zenith did not complete all of the tasks that Silicon Power believed it was required to perform under the JDA and SDA. For example, Silicon Power asked GE Zenith to perform a market study for the LVSTS products and GE Zenith never performed the study. (12/10/07 Arb. N.T. at 61–62.) In addition, GE Zenith did not have Silicon Power's LVSTS products entered into G.E.'s corporation-wide order entry system, SPEEDI. (1/31/08 Arb. N.T. at 125–26.) Silicon Power also complained that GE Zenith did not advertise the LVSTS products as required by Appendix B of the SDA. (SDA App. B.)

### F. *The Arbitration*

As discussed previously, GE Zenith did not have much success selling Silicon Power's LVSTS products. (12/10/07 Arb. N.T.

at 71.) GE Zenith fell significantly short on quote activity and on orders compared to the SDA's targets. (*Id.* at 146, 206.) The relationship between the parties deteriorated significantly as a result. On September 4, 2002, Dr. Mehta sent a letter to James Rogers, President and General Manager of GE Zenith, informing him, pursuant to Article 4.5 of the SDA, that GE Zenith had failed to meet its quarterly orders goal. (GE Zenith Ex. FF.) On December 18, 2002, Rogers wrote a letter to Mehta, offering to waive GE Zenith's right to exclusivity for the sale and distribution of the LVSTS. (12/10/07 Arb. N.T. at 188–89.) In March 2003, an attorney for GE Industrial Systems wrote to Silicon Power, offering to waive exclusivity rights for the LVSTS under the SDA, but stating that GE Zenith would not waive its rights under the JDA with respect to the UFLVSTS. (*Id.* at 190; Silicon Power Ex. 22.) On July 28, 2003, GE Zenith officially terminated the JDA and SDA between GE Zenith and Silicon Power. (12/10/07 Arb. N.T. at 96–97; GE Zenith Ex. GG.)

Silicon Power brought a claim in arbitration against Silicon Power on December 18, 2003. (Silicon Power Ex. 4.) The claim stated, generally, that GE Zenith breached the SDA and JDA by failing to meet its sales targets, failing to use its best efforts to achieve its sales targets, and failing to complete its required tasks under the JDA. Silicon Power also claimed that GE Zenith made material misrepresentations of fact or omitted material facts and provided false information to guide Silicon Power in its business transactions. (*Id.* at 11–13.) Silicon Power initially requested damages in the amount of $12 million, reflecting the sums it expended in preparing for production, lost profits, lost opportunities, and lost enterprise value. (*Id.* at 13–14.) Silicon Power eventually raised its demand, requesting damages for breach of contract in the amount of $371,961,000 and tort damages in the amount of $61,940,000, for a total of $433,901,000. (Silicon Power Ex. 17 at 2–3.)

Silicon Power summarized its claim in its Post–Trial Brief for the arbitrator as follows. GE Zenith was required to understand the critical power market to determine the types, configurations, and designs of LVSTS products the market demanded (such as stand-alone LVSTS products or LVSTS products integrated with PDUs). (*Id.* at 3–4.) GE Zenith did not take the steps necessary to understand these factors and, consequently, selected products for Silicon Power to produce that missed 75% of the critical power market. (*Id.* at 4.) GE Zenith was also required to understand the critical power market to determine the types, configurations and designs of UFLVSTS products the market demanded, but never completed this step. (*Id.*) In addition, since GE Zenith had the exclusive right to market and sell the LVSTS in North America, it was obligated under New York law to use its best efforts to market the LVSTS, but did not. (*Id.* at 4–5.)

The parties appointed John Wilkinson, Esq. as their arbitrator. He heard eleven days of testimony. (Silicon Power Exs. 6–16.) Wilkinson issued a 27 page opinion on June 11, 2008, finding in favor of GE Zenith on all of Silicon Power's claims. (Final Arb. Award at 26.)

Wilkinson first declined "to imply an obligation on the part of GE Zenith to use best efforts to market products covered by the SDA" because GE Zenith did not have "a lock on the market which it could unfairly exploit to Silicon Power's disadvantage." (*Id.* at 8–10.) Wilkinson explained that, since the SDA provided that Silicon Power could terminate GE Zenith's exclusive rights, or terminate the contract en-

tirely, if GE Zenith failed to meet its sales targets for any three month period, the SDA was not the type of exclusive dealing contract for which New York law implies a best efforts obligation. (*Id.* at 10.) He found, instead, that GE Zenith had made a "solid, good-faith effort to market the SP–LVSTS in the face of extreme adversity." (*Id.* at 17.) He supported his finding with the following examples:

1) GE Zenith assigned its best people to the project, i.e., Tim Cole, Spas Lazarov, Tim Duffy (*Id.* at 17–18);

2) GE Zenith made extensive efforts to promote the LVSTS by: issuing a press release; preparing product bulletins; training sales people; preparing promotional materials; promoting the LVSTS at national and regional trade shows; making sales calls on decision makers (owners, architects, engineers, construction managers); conducting lunch and learn sessions; and installing a LVSTS in its Chicago factory and leading demonstration tours for prospective customers. (*Id.* at 18–19.)

3) When sales did not reach hoped for levels, GE Zenith made additional efforts beyond its usual sales practices such as: arranging to pay commissions to salaried personnel from other GE divisions to sell the LVSTS; paying external sales agents for market information; seeking sales outside North America; and cutting its margin on all of its LVSTS sales. (*Id.* at 19.)

Wilkinson also rejected Silicon Power's claim that GE Zenith should have hired additional sales people and used different marketing channels and that GE Zenith was making its sales pitches to the wrong people. (*Id.* at 20.) Wilkinson based his rejection on evidence that GE Zenith contacted the individuals, architectural firms, consulting firms and engineering firms that actually made the decisions that would result in sales. (*Id.*) In addition, Wilkinson found that the SDA specifically required GE Zenith to sell the LVSTS through its "established sales channels[,]" which is what GE Zenith did. (*Id.*) Wilkinson further rejected Silicon Power's claim that GE Zenith failed to advertise the LVSTS as required by the SDA, pointing to testimony from both Rogers and a Silicon Power witness that broad based advertising does not work in the critical power market. (*Id.* at 20–21.)

Wilkinson also rejected Silicon Power's claim that GE Zenith should have required Silicon Power to produce a joint LVSTS/PDU product and that GE Zenith's failure to do so eliminated the Silicon Power LVSTS products from 50% of the marketplace. (*Id.* at 21.) Wilkinson's determination was based on the SDA, which required GE Zenith to sell "Products," which the SDA defines as the LVSTS and the UFLVSTS, not as a combined PDU/LVSTS product. (*Id.*) Wilkinson further found that GE Zenith had considered selling a combined product but determined, in good faith, that it could not sell a combined product at a competitive price. (*Id.*)

Wilkinson also denied Silicon Power's claim that GE Zenith breached the SDA by failing to market a four-pole LVSTS product, which is the prevailing configuration for LVSTS products outside of North America. (*Id.*) The arbitrator found that the SDA, which pertained to North American sales, specifically provided for sales of a three-pole LVSTS. (*Id.*) Wilkinson further denied a claim made by Silicon Power that GE Zenith breached the SDA by failing to begin its marketing efforts before the execution of the SDA. (*Id.*) The arbitrator found that the SDA did not require GE Zenith to begin its marketing efforts

before the effective date of that contract, which was September 21, 2001. (*Id.*)

Wilkinson also denied Silicon Power's claims that GE Zenith made intentional and negligent misrepresentations of material facts prior to executing the SDA and JDA. Silicon Power claimed that GE Zenith made the following misrepresentations: "(I) GE Zenith's sales force was capable, well qualified and experienced in the market in which the LVSTS would be sold; (ii) GE Zenith knew and understood the market for the LVSTS; and (iii) GE Zenith had optimistic expectations for sales of the LVSTS." (*Id.* at 21–22.) The arbitrator found, contrary to Silicon Power's claims, that these statements were true and reflected the good faith opinions of the individuals who made them. (*Id.* at 22–23.)

Wilkinson also addressed Silicon Power's specific claims that GE Zenith breached the JDA by failing to complete the tasks it was assigned under the scope of work provision found in Attachment D to that agreement. The arbitrator found that the JDA's scope of work provision assigned responsibility for developing the UFLVSTS technology to Silicon Power and assigned to GE Zenith only tasks pertaining to selling the developed technology, such as holding a customer focus meeting, formulating an order-to-remittance strategy plan, conducting a critical to quality review, and formulating a "Market/Commercial Plan." (*Id.* at 24.) While Silicon Power claimed that GE Zenith failed to complete tasks involving market analysis, Wilkinson disagreed, noting that the record contained evidence that GE Zenith had provided some market feedback to Silicon Power. (*Id.* at 24.) He also concluded that, even if GE Zenith had breached this provision of the JDA, its breach was not the reason why Silicon Power was unable to develop the UFLVSTS technology into a commercial product. (*Id.* at 24–25.) He found, instead, that the reason why the UFLVSTS was not introduced "was attributable to the fact that Silicon Power did not design and develop a marketable UFLVSTS." (*Id.* at 25.) The arbitrator based his finding on a Silicon Power e-mail sent to GE Zenith in April 2003, which stated that Silicon Power had not made progress on the UFLVSTS due to lack of funding and its own decision to focus its R & D money on other technology. (*Id.* at 25; GE Zenith Ex. Y.) The arbitrator also relied on an April 2003 e-mail from GE Zenith's technology director to James Rogers, stating that Silicon Power could not produce the UFLVSTS " 'reliably and in volume.' " (Final Arb. Award at 25 (quoting GE Zenith Ex. II).)

Silicon Power asserts three grounds for vacating the Final Arbitration Award. Silicon Power first argues that the Final Arbitration Award should be vacated because Wilkinson ignored pertinent and material evidence that Silicon Power had developed a prototype of the UFLVSTS and further ignored material evidence proving that GE Zenith breached the JDA. Silicon Power argues second that the Final Arbitration Award should be vacated because Wilkinson failed to address all of the claims asserted in the arbitration. Silicon Power argues third that the Final Arbitration Award should be vacated because the arbitrator manifestly disregarded New York law with respect to GE Zenith's duty to use its best efforts to sell Silicon Power's LVSTS.

## II.   STANDARD OF REVIEW

The FAA provides for expedited judicial review of arbitration awards. *See* 9 U.S.C. § § 9–11. Under § 9 of the FAA, a court must confirm an award unless it is vacated, modified, or corrected as permitted in §§ 10 and 11. *Id.* § 9. "There is a strong

presumption under the [FAA] in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir.2005) (citation omitted). Thus, an award is generally presumed valid and judicial review is extremely deferential. *Id.; see also Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003).

The party seeking to vacate the award bears the burden of proving that vacatur is appropriate. *AAMCO Transmissions, Inc. v. Sally*, Civ. A. No. 08–151, 2008 WL 5272449, at *3 (E.D.Pa. Dec. 17, 2008) (citation omitted). "Vacatur is appropriate only in 'exceedingly narrow' circumstances ...." *Metromedia Energy, Inc. v. Enserch Energy Servs.*, 409 F.3d 574, 578 (3d Cir. 2005) (citations omitted). A court may not vacate an arbitration award because the arbitrator made an error of law. *Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc.*, 773 F.2d 530, 533 (3d Cir.1985). Moreover, "an arbitrator's 'improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award.'" *Metromedia Energy*, 409 F.3d at 578 (quoting *Major League Umpires Assoc. v. Am. League of Professional Baseball Clubs*, 357 F.3d 272, 279–80 (3d Cir.2004)). A court may never "vacate an arbitration award merely because it views the merits of the claims differently or because the court feels that the arbitrator made a factual or legal error." *Jones v. Intarome Fragrance Corp.*, Civ. A. No. 04–5625, 2007 WL 1296656, at *3 (D.N.J. Apr. 27, 2007) (citations omitted); *see also Local 863*, 773 F.2d at 534 ("The court may not reevaluate supposed inconsistencies in the arbitrator's logic or review the merits of the arbitrator's decision.").

Section 10 of the FAA provides the exclusive grounds for vacatur of arbitration awards under the FAA. *Hall Street Assoc.,*

*L.L.C. v. Mattel Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 1404–06, 170 L.Ed.2d 254 (2008). This section provides four instances in which a district court may vacate an arbitration award:

> "(1) where the arbitration was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made."

9 U.S.C. § 10(a). Silicon Power bases its Motion to Vacate Arbitration Award on subsections three and four. (9/11/09 Tr. at 4.)

Misconduct under § 10(a)(3) does not mean bad faith, but refers to "'misbehavior though without taint of corruption or fraud, if born of indiscretion.'" *Sherrock Bros., Inc. v. DaimlerChrysler Motors Co.*, 260 Fed.Appx. 497, 501 (3d Cir.2008) (quoting *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir.1968)). Moreover, although Section 3 provides for vacatur if the arbitrator refuses to hear pertinent and material evidence, not "'every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award.'" *Id.* (quoting *Newark Stereotypers' Union*, 397 F.2d at 599). Indeed, misconduct will not be found under § 10(a)(3) "'unless the aggrieved party was denied a fundamentally fair hearing.'" *Id.* (quoting *InterCarbon Bermuda, Ltd. v. Caltex Trading and*

*Transport Corp.*, 146 F.R.D. 64, 72 (S.D.N.Y.1993) and citing *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995 (3d Cir.1997)).

In order to obtain vacatur under § 10(a)(4), the movant must establish that the terms of the arbitration award are "completely irrational." *Southco, Inc. v. Reell Precision Mfg. Corp.*, 556 F.Supp.2d 505, 511 (E.D.Pa.2008), *aff'd Southco, Inc. v. Reell Precision Mfg. Corp.*, 331 Fed. Appx. 925 (3rd Cir.2009) ("*Southco II*"). "For an award to be 'completely irrational,' it is not enough that a court finds that the arbitrators erred, but rather it must find that their decision escaped the bounds of rationality." *Id.* at 511 (citing *Clarendon Nat'l Ins. Co. v. NCO Fin. Sys., Inc.*, Civ. A. No. 03–69, 2004 WL 838136, at *2 (E.D.Pa. Apr. 8, 2004)). In other words, there must be "no support in the record for its determination." *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir.1993) (quoting *News America Publ'ns v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir.1990)).

In addition to its claims for vacatur asserted explicitly pursuant to §§ 10(a)(3) and (4), Silicon Power also contends that the Final Arbitration Award should be vacated because the arbitrator manifestly disregarded the law with respect to its claims. The "manifest disregard of the law" doctrine is not an independent ground for vacatur, but is shorthand for the grounds provided for vacatur by § 10(a). *Hall Street*, 128 S.Ct. at 1404–06. As the Supreme Court explained, manifest disregard may "refer[ ] to the § 10 grounds collectively, rather than adding to them," or it may be "shorthand for § 10(a)(3) or § 10(a)(4), the subsections authorizing vacatur when the arbitrators were 'guilty of misconduct' or 'exceeded their powers.'" *Id.* at 1404. Silicon Power relies on mani-

fest disregard as shorthand for §§ 10(a)(3) and (4). (9/11/09 Tr. at 4.)

## III. DISCUSSION

### A. *Contractual Prohibition on Appealing the Arbitrator's Award*

█ Before we begin our analysis of Silicon Power's challenges to the Final Arbitration Award, we must address GE Zenith's threshold argument that the Motion to Vacate the Arbitration Award should be denied because both the SDA and the JDA bar the filing of such a motion. The SDA and JDA both provide that the arbitrator's decision may not be appealed: "[n]either party shall seek recourse to a law or equity court or other authorities to appeal such decision." (SDA, Article 15.5; JDA, Article 7.)

GE Zenith relies on *Tabas v. Tabas*, 47 F.3d 1280 (3d Cir.1995) (*en banc*), as supporting its position that the contractual restrictions on appealing the arbitrator's decision should be enforced to bar the instant challenge to the Final Arbitration Award. In *Tabas*, the United States Court of Appeals for the Third Circuit considered whether an arbitrator had properly found that the plaintiff could bring certain claims against the defendant. *Id.* at 1282. The parties had agreed that the arbitrator's decision would be "final, binding and non-appealable." *Id.* (citation omitted). The Third Circuit recognized that, as a consequence, "we must adhere to it under federal and Pennsylvania law." *Id.* at 1288. However, the Third Circuit did not hold that the parties in that case were barred from challenging the arbitration award under the limited grounds provided by § 10(a) of the FAA. *Id.* Indeed, the Third Circuit specifically considered in that case whether the defendant had alleged "any action on the part of [the arbitrator] amounting to corruption, fraud, or partiality" and whether there was evidence "that

[the arbitrator] failed to provide a hearing to consider each party's views prior to his decision." *Id.* We conclude that *Tabas* does not support GE Zenith's argument that Article 15.5 of the SDA and Article 7 of the JDA preclude Silicon Power's challenge to the Final Arbitration Award pursuant to § 10(a).

■ Contract language stating that an arbitrator's decision is final and non-appealable generally does not prohibit review of the arbitrator's conduct pursuant to § 10(a). It only bars the disgruntled party from appealing the merits of the arbitration award. *See Southco II*, 331 Fed. Appx. at 927–28 (stating that "generally, a contract provision stating that arbitration is 'non-appealable' signifies that the parties to the contract may not appeal the merits of the *arbitration;* not that the parties agree to waive a right to appeal the district court's judgment confirming or vacating the arbitration decision" (citing *Tabas*, 47 F.3d at 1288 and *Rollins, Inc. v. Black*, 167 Fed.Appx. 798, 799 n. 1 (11th Cir.2006))). *See also Rollins*, 167 Fed. Appx. at 799 n. 1 ("A 'binding, final, and non-appealable' arbitral award does not mean the award cannot be reviewed. It simply means the parties have agreed to relinquish their right to appeal the merits of their dispute; it does not mean the parties relinquish their right to appeal an award resulting from an arbitrator's abuse of authority, bias, or manifest disregard of the law." (citing *Dean v. Sullivan*, 118 F.3d 1170, 1171 (7th Cir.1997); *Baugher v. Dekko Heating Tech.*, 202 F.Supp.2d 847, 850 (N.D.Ind.2002); and *Team Scandia, Inc. v. Greco*, 6 F.Supp.2d 795, 798 (S.D.Ind.1998))). As the Second Circuit has cogently explained, the federal courts have found that an arbitration clause that bars appeal of an arbitrator's decision may not prevent a party from asserting a challenge to the arbitrator's conduct pursuant to § 10(a):

> An agreement that contemplates confirmation but bars all judicial review presents serious concerns. Arbitration agreements are private contracts, but at the end of the process the successful party may obtain a judgment affording resort to the potent public legal remedies available to judgment creditors. In enacting § 10(a), Congress impressed limited, but critical, safeguards onto this process, ones that respected the importance and flexibility of private dispute resolution mechanisms, but at the same time barred federal courts from confirming awards tainted by partiality, a lack of elementary procedural fairness, corruption, or similar misconduct. **This balance would be eviscerated, and the integrity of the arbitration process could be compromised, if parties could require that awards, flawed for any of these reasons, must nevertheless be blessed by federal courts. Since federal courts are not rubber stamps, parties may not, by private agreement, relieve them of their obligation to review arbitration awards for compliance with § 10(a).**

*Hoeft v. MVL Group, Inc.*, 343 F.3d 57, 64–65 (2d Cir.2003) (emphasis added) (citing *I/S Stavborg v. Nat'l Metal Converters, Inc.*, 500 F.2d 424, 427 (2d Cir.1974), *overruled on other grounds*, *Hall Street*, 128 S.Ct. at 1403–04).

We conclude, accordingly, that the SDA's and JDA's contractual bars on appealing the decision of the arbitrator applies solely to an appeal of the merits of the arbitration and not to a motion to vacate arbitration award that challenges the conduct of the arbitrator pursuant to § 10(a). As Silicon Power's Motion to Vacate Arbitration Award asks us only to review the conduct of the arbitrator pursu-

ant to §§ 10(a)(3) and (4), and does not require us to weigh the merits of the parties' dispute, it is not barred by Article 15.5 of the SDA or by Article 7 of the JDA. We will thus address the merits of Silicon Power's arguments.

### B. *Failure to Consider Evidence Pertinent and Material to the Controversy*

Silicon Power argues that the Final Arbitration Award should be vacated pursuant to § 10(a)(3) because Wilkinson ignored material evidence that Silicon Power had developed a prototype UFLVSTS and that GE Zenith breached the JDA by failing to complete tasks assigned to it by that Agreement. Silicon Power maintains that Wilkinson "poisoned" the arbitration by failing to recognize the existence of its prototype UFLVSTS. (9/11/09 Tr. at 5–6.) Silicon Power further contends that Wilkinson engaged in misconduct sufficient to require vacating the Final Arbitration Award pursuant to § 10(a)(3) by:

> Fabricating reality that didn't exist in any way, anywhere else, except in his mind, specifically as to the existence of the key piece of the steps that Silicon Power had to take, No. 1. And, No. 2, specifically as to the concept, black-and-white on the contract's face, the steps are serial and required to be done one before the other.

(9/11/09 Tr. at 10.) This argument is completely meritless.

#### 1. *The UFLVSTS prototype*

■ In asserting that the arbitrator ignored evidence that Silicon Power had developed a prototype of the UFLVSTS, Silicon Power relies on a single sentence in the Final Arbitration Award: "[e]ven today, 6½ years after the parties signed the JDA, Silicon Power has still not built a prototype for a UFLVSTS." (Final Arb.

Award at 25.) In fact, as Silicon Power points out, the record is replete with evidence that the UFLVSTS prototype existed; indeed, Dr. Mehta brought it with him to the arbitration where Wilkinson saw it, and several witnesses testified about it. 8/20/07 Arb. N.T. at 23–24, 28; 12/10/07 Arb. N.T. at 171–72, 175.) Thus, taken out of context, the sentence on which Silicon Power relies suggests that the arbitrator ignored record evidence. However, it is plain from the remainder of the Final Arbitration Award, that the arbitrator actually meant only that Silicon Power has not developed a *commercially viable* prototype, a position that is well supported in the record. The relevant portion of the Final Arbitration Award states as follows:

> In the end, the reason the UFLVSTS was not introduced had nothing to do with "lack of market feedback" from GE Zenith but rather was attributable to the fact that Silicon Power did not design and develop a marketable UFLVSTS. Thus, for example, Jack Ladden (Silicon Power) wrote to Jim Rogers on April 30, 2003, stating
>
>> Progress on UFLVSTS has taken a back seat to other Silicon Power issues in the last year. This is primarily because originally the development was to be funded by outside R & D and the proceeds from the sale of LVSTS product. R & D income has been focused on pulse type (rather than switch type) products … and there has been no income from LVSTS.
>
> And Indra Purkayastha, GE's technology director, wrote to James Rogers on April 29, 2003 stating that the UFLVSTS still had "Big Time" potential and "would be a game changer" in the market except that Silicon Power could not produce the product "reliably and in volume."

Silicon Power's response that it could not develop the ultrafast technology because GE Zenith would not tell it what to build is without merit. The specifications in the JDA tell Silicon Power exactly what the two parties decided they would build. SPCO could not develop the ultrafast technology because it could not get it to work in a commercial product. **Even today, 6½ years after the parties signed the JDA, Silicon Power has still not built a prototype for a UFLVSTS.**

(Final Arb. Award at 25 (emphasis added).)

There is support in the record for the arbitrator's conclusion that Silicon Power could not build a commercially viable UFLVSTS. The arbitrator correctly quoted Ladden's April 30, 2003 email and Purkayastha's April 29, 2003 e-mail. (GE Zenith Exs. Y, II.) In addition, Rogers testified that, even though Silicon Power had a working prototype of the technology, it did not have a prototype that could be sold commercially or manufactured in quantity or that was ready to be sold in the market. (12/10/07 Arb. N.T. at 171.) Rogers explained that having a working prototype is not the same as "saying that the product is ready to be commercialized or can be manufactured in quantity or can be brought to market or any of those kinds of things." (*Id.* at 172.)

We cannot vacate an arbitration award based on an arbitrator's misconduct in ignoring material evidence " 'unless the aggrieved party was denied a fundamentally fair hearing.' " *Sherrock Bros.*, 260 Fed. Appx. at 501 (citations omitted). This single sentence, taken out of context, at the conclusion of a well supported page of

analysis, simply does not establish that Silicon Power was denied a fundamentally fair hearing. Silicon Power's claim that the Final Arbitration Award should be vacated pursuant to § 10(a)(3) based on Wilkinson's comment that "[e]ven today, 6½ years after the parties signed the JDA, Silicon Power has still not built a prototype for a UFLVSTS" is, accordingly, denied.

2. *GE Zenith's failure to complete tasks required by the JDA*

■ Attachment D to the JDA provides a scope of work for development of the UFLVSTS by listing specific tasks to be performed by GE Zenith and Silicon Power and the dates on which those tasks were to be completed. (JDA, Attach. D.) As mentioned previously, Silicon Power claimed in the arbitration that GE Zenith breached the JDA by failing to complete certain tasks connected with determining customer/market requirements for the development of UFLVSTS products, and further claimed that this breach of the JDA prevented it from developing a commercially viable UFLVSTS product. Wilkinson rejected these claims for three reasons: (1) the record contained evidence that GE Zenith had performed by providing market feedback to Silicon Power; (2) Silicon Power did not need market feedback to develop specifications for a commercially viable UFLVSTS product because the JDA itself contained those specifications; and (3) Silicon Power's failure to develop a commercially viable UFLVSTS product was caused by its own decision to fund other research priorities rather than the development of the UFLVSTS, not by GE Zenith's alleged failure to perform.[3] (Final Arb. Award at 24–25.)

---

**3.** The record of the arbitration contains factual support for all three of the arbitrator's conclusions. While the arbitrator relied on

an e-mail that has not been made a part of the record of the instant motion with respect to GE Zenith's provision of market feedback to

■ Silicon Power contends that Wilkinson committed misconduct requiring that the Final Arbitration Award be vacated pursuant to § 10(a)(3) because he ignored pertinent and material evidence supporting its claim. Silicon Power specifically argues that the arbitrator ignored the fact that the JDA specifically required GE Zenith to perform certain tasks **before** Silicon Power could perform its tasks in connection with development of the UFLVSTS. Indeed, Wilkinson did not find that the scope of work required GE Zenith to perform tasks related to market feedback before Silicon Power developed the ultrafast technology. However, even if this were a factual error, "an arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award." *Metromedia Energy*, 409 F.3d at 578 (quotation omitted). Thus, any such error cannot provide a basis to vacate Wilkinson's award.

■ Silicon Power also contends that the arbitrator ignored admissions by officials of GE Zenith that it did not perform the tasks required by Attachment D to the JDA. Silicon Power correctly notes that Wilkinson did not specifically address the evidence on which Silicon Power relies. In short, that evidence consists of excerpts from the testimony of Rogers and Cole. More specifically, Rogers was asked, during the arbitration, to admit that GE Zenith had never obtained the market research it was required to obtain under the JDA. Rogers did not respond directly, but testified that this research was unnecessary because everyone knew what the UFLVSTS was supposed to do: "[i]t was to replace the low-voltage static transfer switch; faster, lower cost, smaller, better performing characteristics." (12/10/07 Arb. N.T. at 169.) Rogers was also asked about an e-mail from an employee of Silicon Power, which apparently requested guidance from GE Zenith regarding customer requirements for the UFLVSTS.[4] Rogers testified that he was not listed as a recipient of the e-mail and did not know if he had ever seen it before. (*Id.* at 181.) Cole was asked about an email he had sent to Duffy, stating that "[t]o date we have done very little with regards to the ultrafast development." (1/31/08 Arb. N.T. at 148.) Cole explained during the arbitration that he did not mean that GE Zenith was not performing its assigned tasks under the JDA, he meant that both companies had not focused on developing this technology. (1/31/08 Arb. N.T. at 148–49.) We conclude that none of this testimony so supports Silicon Power that the arbitrator's failure to discuss it deprived Silicon Power of a fundamentally fair hearing. *Sherrock Bros.*, 260 Fed.Appx. at 501 (citations omitted).

■ In any event, Wilkinson did not base his decision denying Silicon Power's breach of contract claim on evidence, or lack of evidence, that GE Zenith had failed to perform under the JDA. Rather, he concluded, as a factual matter, that "the

Silicon Power (Final Arb. Award at 24), there is other evidence on the record before us that GE Zenith provided market feedback to Silicon Power regarding the types of switching products that were demanded by the relevant market. (12/10/07 N.T. at 67–70, 72;12/13/07 Arb. N.T. at 210–11.) There is also evidence that the JDA contained specifications for the UFLVSTS products that Silicon Power was supposed to develop. (Silicon Power Ex. 2, Attach. B (detailed specifications for the UFLVSTS); 12/10/07 Arb. N.T. at 169–70.) The record also contains evidence that Silicon Power's failure to develop a marketable UFLVSTS product was caused by its own failure to fund its research and development. (GE Zenith Exs. Y, II.)

4. Neither party has submitted a copy of this e-mail to this Court.

reason the UFLVSTS was not introduced had nothing to do with 'lack of market feedback' from GE Zenith but rather was attributable to the fact that Silicon Power did not design and develop a marketable UFLVSTS." (Final Arb. Award at 25.) Silicon Power contends that Wilkinson manifestly disregarded New York law in order to reach this conclusion and, consequently, that the arbitration award should be vacated pursuant to §§ 10(a)(3) and (4).

"Manifest disregard for the law means more than mere legal error or misunderstanding." *Sherrock Bros.*, 260 Fed.Appx. at 499 (citing *Tanoma Mining. Co., Inc. v. Local Union No. 1269*, 896 F.2d 745, 749 (3d Cir.1990)). "Rather, 'the decision must fly in the face of clearly established legal precedent ....'" *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir.1995)). Such a situation exists "where an arbitrator 'appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.'" *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986)).

In order to succeed on a claim for breach of contract under New York law, a plaintiff must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996); *see also First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998). Consequently, "unless a plaintiff has performed the contract pursuant to its terms, the plaintiff has not established all of the required elements for sustaining a breach of contract claim, even if the other elements are satisfied." *Hermandad Y Asociados, Inc. v. Movimiento Misionero Mundial, Inc.*, No. 100211/06, 22 Misc.3d 1138(A), 2009 WL 765036, at *3 (N.Y.Sup.Ct. Mar. 6, 2009).

As discussed previously (*supra* at 539–40), Wilkinson relied on two e-mails, both of which state that Silicon Power had not made progress in developing a commercially viable UFLVSTS, to conclude that Silicon Power had not performed its duties under the JDA. The first e-mail was the April 23, 2003 e-mail sent by Purkayastha to Rogers. (Final Arb. Award at 25; GE Zenith Ex. II.) The second e-mail was the April 30, 2003 e-mail sent by Ladden to Rogers. (Final Arb. Award at 25, GE Zenith Ex. Y.)

■ New York law provides that a plaintiff may not succeed on a breach of contract claim where the plaintiff has not, itself, adequately performed under the contract. *Harsco*, 91 F.3d at 348; *Hermandad*, 22 Misc.3d 1138(A), 2009 WL 765036, at *3. We find that there is evidence on the record of the arbitration that supports Wilkinson's conclusion that Silicon Power failed to adequately perform the tasks it was assigned by the JDA and that its failure to perform those tasks was not a result of GE Zenith's failure to provide it with customer and market information. Consequently, we conclude that the arbitrator's determination that Silicon Power had not proven its claim that GE Zenith breached the JDA did not manifestly disregard New York law. Silicon Power's claim that the Final Arbitration Award should be vacated pursuant to §§ 10(a)(3) and (4) because the arbitrator ignored pertinent and material evidence that GE Zenith breached the JDA and because the arbitrator manifestly disregarded New York law is, accordingly, denied.

### C. *Failure to Address All Claims Asserted in the Arbitration*

Silicon Power further argues that the Final Arbitration Award should be vacated

pursuant to § 10(a)(4) because Wilkinson failed to address all of the claims asserted by the parties in the arbitration, thereby failing to make a "mutual final definite award." (9/11/09 Tr. at 14.) Silicon Power specifically contends that the arbitrator failed to address the parties' conflicting claims to ownership of the UFLVSTS technology. (*Id.* at 14.) Silicon Power is correct that the Final Arbitration Award does not address ownership of the UFLVSTS technology. However, Silicon Power admitted during our September 11, 2009 Hearing that it did not assert a claim regarding ownership of the technology in the arbitration. (*Id.* at 14–15, 27.) Rather, Silicon Power contends that GE Zenith asserted a claim to ownership of the UFLVSTS technology during the arbitration, through its submission of arbitration exhibit 72. (*Id.* at 15, 28; Silicon Power Ex. 22.) GE Zenith insists that it did not make such a claim and that the issue of ownership was not presented to the arbitrator. (9/11/09 Tr. at 30.)

Arbitration Exhibit 72 is a letter sent by Gerald P. Devine, an attorney for GE Industrial Systems, to Dr. Mehta on March 6, 2003. (Silicon Power Ex. 22.) In this letter, Devine responds to an assertion made by Dr. Mehta that GE Zenith had breached the JDA and contends that Silicon Power is, instead, the party that breached the JDA. (*Id.* at 1.) The letter also states GE Zenith's willingness to go to arbitration to resolve the dispute over the breach of the JDA. (*Id.* at 2.) In the penultimate paragraph of this letter, Devine wrote: "[a] s mentioned, GEZ will waive its exclusivity rights under the [SDA] with regards to the LVSTS. Please note, however, that in no way is GEZ waiving any of its rights under the JDA or [SDA] with respect to the UFLVSTS." (*Id.*) The letter does not, however, assert any intention to proceed to arbitration over ownership of the UFLVSTS technology. Moreover, De-

vine's letter was merely admitted into evidence during the arbitration, it was not in any way flagged as a pleading or a statement of claim. Consequently, we find that GE Zenith's submission of Devine's letter during the course of the arbitration did not, by itself, alert the arbitrator that either of the parties expected him to decide a dispute regarding the ownership of the UFLVSTS technology.

■ Both parties have clearly and emphatically denied that they ever asked the arbitrator to decide which of them owns the UFLVSTS technology. (9/11/09 Tr. at 14–15, 27, 30.) We therefore conclude that this claim was not raised in the arbitration and that Wilkinson's failure to decide the ownership issue did not prevent him from making "a mutual, final, and definite award upon the subject matter" of the arbitration. 9 U.S.C. § 10(a)(4). Silicon Power's claim to the contrary is, accordingly, denied.

### D. *Manifest Disregard for Applicable Law*

■ Silicon Power also argues that the Final Arbitration Award should be vacated pursuant to § § 10(a)(3) and (4) because Wilkinson manifestly disregarded New York law when he determined that GE Zenith was not obligated to use its "best efforts" to sell Silicon Powers' LVSTS products. Silicon Power's argument focuses on N.Y. U.C.C. § 2–306(2), pursuant to which a court may imply a "best efforts" requirement in an exclusive dealing arrangement. Under New York law, when a distributor has an exclusive distribution agreement with the manufacturer of a product, the distributor may be obligated to use its "best efforts" to sell the product. *See MDC Corp., Inc. v. John H. Harland Co.*, 228 F.Supp.2d 387, 392 (S.D.N.Y.2002) ("Under the U.C.C., '[a] lawful agreement

by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.'" (quoting N.Y. U.C.C. § 2–306(2) (McKinney 2001))).[5] Silicon Power claimed in the arbitration that GE Zenith was required under New York law to use its best efforts to sell the LVSTS and failed to do so. The arbitrator, however, found that GE Zenith was not obligated to use its best efforts to sell the LVSTS because Silicon Power could terminate GE Zenith's exclusive right to sell the LVSTS if GE Zenith fell short of its sales targets for any three month period. (Final Arb. Award at 8–10.) According to Silicon Power, the arbitrator could reach this result only by manifestly disregarding applicable New York law.

Wilkinson relied on *G. Golden Assoc. of Oceanside, Inc. v. Arnold Foods Co., Inc.,* 870 F.Supp. 472 (E.D.N.Y.1994),[6] to explain the best efforts requirement:

> It is well settled under New York law that where ongoing commissions or royalties are to be paid in an exclusive arrangement, a court will imply a covenant on the part of an exclusive licensee/assignee to exploit the subject matter of the license/assignment with due diligence "where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole."

*Id.* at 476 (quoting *Vacuum Concrete Corp. of America v. American Mach. & Foundry Co.,* 321 F.Supp. 771, 772 (S.D.N.Y.1971), and citing *Mechanical Ice Tray Corp. v.*

*General Motors Corp.,* 144 F.2d 720, 726 (2d Cir.1944); *Parev Products Co., Inc. v. Rokeach & Sons, Inc.,* 124 F.2d 147, 150 (2d Cir.1941); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., Inc.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, 144 (N.Y.1972), and *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214, 214 (1917) (Cardozo, J.), *reh'g denied,* 222 N.Y. 643, 118 N.E. 1082 (1918)). New York law implies a best efforts obligation because: "it would be unfair to place the productiveness of licensed [or assigned] property solely within the control of the licensee [or assignee], thereby putting the licensor [or assignor] at his mercy, without imposing an obligation to exploit upon the licensee [or assignee]." *Id.* (citing *Vacuum Concrete,* 321 F.Supp. at 773, and *Zilg v. Prentice–Hall, Inc.,* 717 F.2d 671, 678, 680 (2d Cir. 1983)). Wilkinson focused his analysis of whether GE Zenith was obligated to use its best efforts to sell the LVSTS on whether the SDA put Silicon Power at the mercy of GE Zenith without imposing an obligation to sell the LVSTS on GE Zenith. (Final Arb. Award at 9–10.) This focus is consistent with New York law as summarized by *G. Golden Associates.*

Wilkinson found that the SDA did not put Silicon Power at the mercy of GE Zenith because Silicon Power could terminate the exclusivity provision of the SDA, or terminate the SDA, if GE Zenith failed to meet its sales targets for three months. (*Id.* at 8–9.) Consequently, the arbitrator found that he need not imply a best efforts obligation in the SDA. (*Id.* at 9–10.) He relied on three cases to support his conclusion: *Permanence Corp. v. Kennametal, Inc.,* 908 F.2d 98 (6th Cir.1990); *Vacuum*

---

**5.** Best efforts obligations may also be imposed where the buyer is given "an exclusive right to sell a supplier's product in a prescribed territory." *MDC Corp.,* 228 F.Supp.2d at 394 (listing cases).

**6.** Wilkinson quotes extensively from *G. Golden Associates* on page 6 of the Final Arbitration Award.

*Concrete,* and *Kardios Systems Corp. v. Perkin–Elmer Corp.,* 645 F.Supp. 506 (D.Md.1986). Silicon Power argues that Wilkinson's reliance on these cases establishes his manifest disregard for the law.

### 1. *Permanence Corp. v. Kennametal, Inc.*

Permanence sued Kennametal for breach of contract, claiming that Kennametal had failed to use its best efforts to exploit certain patents that it had exclusively licensed from Permanence. *Permanence,* 908 F.2d at 99. The *Permanence* court declined to imply that Kennametal was required to use its best efforts because that company had made a payment of $250,000 for the exclusive license:

> The total payment of $250,000 for the exclusive license to the patents provided sufficient incentive and demonstration of good faith that Kennametal would attempt to commercialize and market the Permanence process. This is not a case where the licensor (Permanence) depended for its sole compensation for the licensed patents upon royalties generated by the exclusive agency granted to Kennametal. The implication of a best efforts obligation is therefore not necessary to establish mutuality of obligation. Moreover, we find that if Permanence wished to bind Kennametal to a best efforts commitment in the circumstances of the present case, it was incumbent upon Permanence to spell out this obligation in the formal written agreement.

*Id.* at 103.

Wilkinson cited *Permanence* for the proposition that "an obligation to employ best efforts would be implied only when 'necessary to protect the licensor from the possibility that the licensee will do nothing.'" (Final Arb. Award at 9.) Silicon Power argues that the arbitrator's reliance on *Permanence* demonstrates his manifest disregard for the law because the SDA requires the arbitrator to use New York Law and this case was decided by the United States Court of Appeals for the Sixth Circuit. Silicon Power relies on *N.Y. Tel. Co. v. Commc'ns Workers of Am. Local 1100,* 256 F.3d 89 (2d Cir.2001) (*per curiam*), in which the Second Circuit found that an arbitrator had manifestly disregarded the law by relying on opinions from outside of the Second Circuit where there was a controlling Second Circuit case on point. *Id.* at 93 ("These opinions are not the law of this Circuit; it was therefore 'manifest disregard of the law' for the arbitrator to reject [the controlling Second Circuit authority] and apply another rule." (footnote omitted) (citing *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998))). It is well recognized, however, that New York law regarding when a best efforts clause will be implied in a contract is far from clear:

> In one of the leading cases applying an express "best efforts" provision, Judge Friendly commented that "the New York law is far from clear" (*see Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 613 [2d Cir.1979]); twenty years later another federal court found it "murky" (*see McDonald's Corp. v. Hinksman,* 1999 WL 441468, *12, 1999 U.S. Dist. LEXIS 9587, *36 [E.D.N.Y.].) It is still unclear when and how an express "best efforts" provision is to be enforced in the absence of articulated objective criteria in the agreement, and, particularly, the relationship between "best efforts" and "good faith", "fair dealing", and "reasonable care".

*Ashokan Water Services, Inc. v. New Start, LLC,* 11 Misc.3d 686, 807 N.Y.S.2d 550, 553 (N.Y.Civ.Ct.2006). Consequently, there is no controlling case interpreting New York law with respect to when a best efforts requirement will be implied in an exclusive dealing contract, and *N.Y. Tel.*

*Co. v. Commc'ns Workers* is inapplicable to this case.

Silicon Power has, moreover, conveniently ignored the fact that it cited *Permanence* in one of its briefs for the arbitrator.[7] The arbitrator can hardly have engaged in misconduct by relying on authority that Silicon Power asked him to rely on. Furthermore, the United States District Court for the Southern District of New York recognized, in *New Paradigm Software Corp. v. New Era of Networks,* Civ. A. No. 99–12409, 2002 WL 31749396 (S.D.N.Y. Dec. 9, 2002), that the result reached by the Sixth Circuit in *Permanence* is consistent with the results reached by courts applying New York law to decide whether a best efforts obligation should be applied to an exclusive dealing contract. *See id.,* 2002 WL 31749396 at *12 n. 19. We conclude, therefore, that Wilkinson's reliance on *Permanence* did not "fly in the face of clearly established legal precedent" or ignore "the existence of a clearly governing legal principle" of which he was aware and, therefore, did not constitute manifest disregard of applicable law. *Sherrock Bros.,* 260 Fed.Appx. at 499 (internal quotations omitted).

### 2. *Vacuum Concrete*

Vacuum Concrete sued American Machinery and Foundry Co. ("AMF") for breach of contract, claiming that AMF failed to "to make diligent and good faith efforts to exploit a device which Vacuum had licensed to AMF." *Vacuum Concrete,* 321 F.Supp. at 772 (footnote omitted). The *Vacuum Concrete* court refused to imply a best efforts duty on the part of AMF because Vacuum Concrete reserved the right to sell some devices itself within the licensed territory; AMF was obligated

to pay a minimum royalty to Vacuum Concrete each year; and Vacuum Concrete retained the right to terminate the contract after four years if the defendant's royalty payments did not reach an agreed upon amount. *Id.* at 773–74. The court explained its reasoning as follows:

> This is not a case where the licensor (Vacuum) depended for its sole compensation from the licensed device upon the exclusive agency granted to the licensee (AMF). On the contrary, the licensor, by reserving to itself the right to make very substantial sales annually in the licensed territory and by imposing a very substantial minimum annual royalty had, in lieu of obtaining an express agreement from AMF to exploit, protected itself against the possibility that the AMF might do nothing and suppress the invention.

*Id.* at 774 (citing *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917)). Wilkinson relied on *Vacuum Concrete* because the "court refused to imply a good faith sales obligation because the plaintiff was protected by a minimum royalty provision and a right to terminate in four years if sales were not acceptable." (Final Arb. Award at 9.)

Silicon Power argues that the arbitrator's reliance on *Vacuum Concrete* constituted manifest disregard for the law because the facts in that case are distinguishable from the facts in this case. (Silicon Power Mem. at 16–17.) Specifically, Silicon Power contends that *Vacuum Concrete* is inapplicable to the instant case because Silicon Power, unlike Vacuum Concrete, did not have the right to market its own products in the li-

---

7. Silicon Power cited the *Permanence* decision in its Post–Trial Response Brief. (Silicon Power Ex. 18 at 4.) GE Zenith also cited *Permanence* in its Post–Hearing Brief. (Silicon Power Ex. 19 at 26.)

censed territory. While this does, indeed, constitute a factual difference between the two cases, it is not so vast that the arbitrator's reliance on *Vacuum Concrete* flew "in the face of clearly established legal precedent." *Sherrock Bros.*, 260 Fed.Appx. at 499. We conclude that Wilkinson's reliance on *Vacuum Concrete* did not manifestly disregard New York law.

### 3. *Kardios Systems Corp. v. Perkin–Elmer Corp.*

Perkin–Elmer contracted to distribute computer equipment manufactured by Kardios Systems. *Kardios Systems*, 645 F.Supp. at 507. The contract made Perkin–Elmer the exclusive distributor of the computer equipment with the following limitations: "(1) there was an express reservation for Kardios 'to maintain its present distributorship arrangement with ... [two] Kardios distributors,' and (2) Kardios had the right to terminate Perkin–Elmer's exclusive right to market after eighteen months if Perkin–Elmer had not sold 100 units." *Id.* The agreement also provided that "Kardios was to receive a royalty payment on each sale and, in addition, Perkin–Elmer paid Kardios ... $20,000 and relieved $10,000 of Kardios' existing debt to Perkin–Elmer...." *Id.* Perkin–Elmer only sold 20 units over three years *Id.* at 508. As a result of Perkin–Elmer's failure to generate sales, Kardios terminated the exclusivity provision in the agreement and filed suit against Perkin–Elmer for breach of contract, claiming that Perkin–Elmer had breached the implied best efforts requirement in their agreement. *Id.* at 506, 508. The *Kardios* court declined to infer the existence of a best efforts requirement in the contract between Kardios and Perkin–Elmer under New York law because this was "not an instance in which Kardios was 'at Perkin–Elmer's mercy' under the terms of the contract." *Id.* at 509. The *Kardios* court first noted that "implied duties are strongly disfavored under New York law" and stated that "the existence of a best efforts obligation should not be lightly inferred since such an obligation subjects the licensee to significant litigation exposure and deprives him of the fundamental power of determining for himself the reasonableness of his marketing efforts." *Id.* at 509 (citing *In re KDT Industries, Inc.*, 30 B.R. 252 (S.D.N.Y.1983), and *Murphy v. American Home Prod. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)). The court then reviewed the four reasons why Kardios was not at Perkin–Elmer's mercy: (1) Kardios could terminate the agreement if Perkin–Elmer did not sell 100 units in the first 18 months of the agreement; (2) Perkin–Elmer did not have the exclusive right to market Kardios' product because Kardios had retained the right to market through two pre-existing distributors; (3) Kardios received significant payments under the agreement that were independent of its royalties from sales; and (4) Kardios had sought to include an explicit best efforts obligation in earlier versions of its contract with Perkin–Elmer, yet their final contract did not contain such a clause. *Id.* at 509–10. Wilkinson relied on *Kardios Systems* because the court in that case refused to imply the existence of a best efforts obligation at least in part because *Kardios Systems* could terminate the contract if Perkin–Elmer did achieve its sales requirements. (Final Arb. Award at 9–10.)

Silicon Powers argues that the arbitrator manifestly disregarded the law by relying on *Kardios Systems*, because the facts of *Kardios Systems* are sufficiently different from the facts of this case to

make *Kardios Systems* inapplicable to the instant dispute.[8] (Silicon Power Mem. at 17–18.) Specifically, Silicon Power contends that *Kardios* is inapplicable to this case because Kardios, unlike Silicon Power, received an advance payment of royalties and had alternative sources of distribution. While there are, indeed, some factual differences between the instant case and *Kardios Systems,* the factual differences between the cases are not so vast that the arbitrator's reliance on *Kardios Systems* flew "in the face of clearly established legal precedent." *Sherrock Bros.,* 260 Fed.Appx. at 499. We conclude that Wilkinson's reliance on this case did not manifestly disregard New York law.

To the contrary, we find that *Permanence, Vacuum Concrete,* and *Kardios* each provide some additional support for Wilkinson's decision, which primarily relied on New York law as set forth in *G. Golden Assoc.* Moreover, even assuming arguendo that Wilkinson erred as a matter of law by relying on these three additional cases, we cannot vacate an arbitration award solely because the arbitrator made an error of law. *See Local 863,* 773 F.2d 530, 533. We may not vacate an arbitration award based upon an arbitrator's manifest disregard of the law unless the arbitrator was " 'guilty of misconduct' or 'exceeded [his] powers.' " *Hall Street,* 128 S.Ct. at 1404–06. We conclude that Wilkinson did not engage in misconduct or exceed his powers by relying on *Permanence, Vacuum Concrete,* and *Kardios.* Silicon Power's claim that the Final Arbitration Award should be vacated pursuant to §§ 10(a)(3) and (4) because the arbitrator manifestly disregarded New York law is, accordingly, denied.

---

**8.** Although *Kardios* was decided by the United States District Court for the District of Maryland, that court applied New York law. *See Kardios,* 645 F.Supp. at 508–10.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Vacate Arbitration Award is denied in all respects. An appropriate Order follows.

### *ORDER*

**AND NOW,** this 29th day of September, 2009, upon consideration of Silicon Power Corporation's "Motion to Vacate Arbitration Award (Docket No. 1), General Electric Zenith Controls, Inc.'s response thereto, and the Hearing held on September 11, 2009, and for the reasons set forth in the Memorandum dated September 29, 2009, **IT IS HEREBY ORDERED** that the Motion is **DENIED.**